AMERICAN TRUCKING ASSOCIA-TIONS, INC., The Contract Carrier Conference of American Trucking Associations, Inc., National Automobile Transporters Association, Convoy Company, Robertson Truck-A-Ways, Inc., Hadley Auto Transport, B & H Truckaway, Western Auto Transports, Inc., and Kenosha Auto Transport Corp., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants, and Pacific Motor Trucking Company and General Motors Corporation, Intervening Defendants.

Civ. A. No. 2534–58.

United States District Court
District of Columbia.
Jan. 20, 1959.

Peter T. Beardsley, Charles W. Singer, Washington, D. C., for American Trucking Ass'ns, Inc., and Contract Carrier Conference.

Walter N. Bieneman, Detroit, Mich., Larry A. Esckilsen, Washington, D. C., for all other plaintiffs.

Robert W. Ginnane, Gen. Counsel, James Y. Piper, Asst. Gen. Counsel, I. C. C., Washington, D. C., for Interstate Commerce Commission.

William P. Rogers, Atty. Gen., Oliver Gasch, U. S. Atty. for District of Columbia, Washington, D. C., for the United States.

Robert L. Pierce, William Meinhold, San Francisco, Cal., Edward M. Reidy, Thormund A. Miller, Washington, D. C., for intervener Pacific Motor Trucking Co.

Henry M. Hogan, Walter R. Frizzell, Detroit, Mich., Beverley S. Simms, Washington, D. C., for intervener General Motors Corp.

Before BASTIAN, Circuit Judge, and KEECH and CURRAN, District Judges.

KEECH, District Judge.

This is an action by certain motor carrier trade associations and motor carriers to set aside an order of the Interstate Commerce Commission entered September 9, 1958, which directed the issuance, under certain conditions, of motor contract carrier permits under § 209 (b) of the Interstate Commerce Act [49 U.S.C.A. § 309(b)] authorizing Pacific Motor Trucking Company of San Francisco, California, to transport automobiles and trucks, except trailers, in initial movements in truckaway and/or driveaway service, from plants of the General Motors Corporation at Oakland, Raymer, and South Gate, California, to certain named off-rail points in Nevada, and to all points in Oregon, Nevada, Utah, Arizona, and New Mexico which are stations on the rail lines of the Southern Pacific Company.

Pacific Motor Trucking Company (hereinafter referred to as PMT) is a wholly owned motor carrier subsidiary of Southern Pacific Company (hereinafter referred to as SP), which operates an extensive railroad system in Oregon, California, Nevada, Utah, Arizona, New Mexico, and Texas.

PMT since December 10, 1935, has held contract carrier operating authority from the Railroad Commission of California for intrastate operations within that State. The Interstate Commerce Commission (hereinafter referred to as the Commission) has issued to PMT four prior contract carrier permits for transportation of new automobiles, new trucks, and new buses, in initial movements in truckaway and driveaway service (1) from Oakland, California, to the non-rail point of Hawthorne, Nevada, and Nevada rail points on the Southern Pacific (MC 78787, Sub 23, issued June 20, 1944); (2) from Los Angeles, California, to Calexico and San Ysidro, California, both on the Mexican border (MC 78787, Sub 27, issued April 21, 1950); (3) from Raymer, California, to points in the Los Angeles Harbor Commercial Zone, for transshipment by water (MC 78787, Sub 30, issued June 22, 1950); and (4) from Oakland, California, to Carson City and Minden, Nevada, both being non-rail points (MC 78787, Sub 31, issued June 21, 1955). PMT's only shipper under these permits has been GM. Thus, prior to filing of the four new applications involved in this case, the Commission had issued to PMT contract carrier operating authority from GM plants in California for physically interstate service across the state line into Nevada, and for foreign commerce physically within California.

The order complained of grew out of extensive proceedings before the Commission following the filing of the four applications by PMT, seeking to extend its service as a contract carrier for GM in the Pacific Coast area for the transportation of a single commodity, new automobiles and trucks. In general, by the Sub 34 application, PMT sought to extend its contract carrier service from the two GM Chevrolet plants at Oakland, California, to all Oregon points which are stations on SP; by the Sub 35 application, the right to serve three additional non-rail points in Nevada from Oakland, California; by the Sub 36 application, to serve all Arizona points which are stations on SP; and by the Sub 37 application, authority to round out its service areas from the Oakland and Raymer plants to include all points in the seven states of Washington, Oregon, Idaho, Nevada, Utah, Arizona, and New Mexico, whether or not they are stations on SP, and to begin new service from the Buick-Oldsmobile-Pontiac plant at South Gate, California, to a seven-state area, namely, Washington, Oregon, Idaho, Nevada, Utah, Arizona, and Montana. The four sub-proceedings were finally consolidated in Sub 37, from which the order complained of emanated. All of the plaintiffs in this action, who had been protestants in one or more of the other sub-numbers, participated in the consolidated proceeding before the Commission.

By the order here under attack, the Commission granted the authority sought in the Sub 35 proceeding, service from

the Oakland plant to three additional non-rail points in Nevada, which had been opposed by only one protestant, not a party to this action; but as to the Sub 34, 36, and 37 applications, the Commission denied entirely the authority requested to serve destinations in states not served by SP (Washington, Idaho, and Montana) and limited the authority granted to destinations in the other states (Arizona, Nevada, Oregon, Utah, and New Mexico) to points located on the rail lines of SP. Thus, the Commission's order granted only a limited portion of the authority sought in the four applications, and issuance of the new permits thereunder was conditioned on curtailment of existing common carrier authority to transport automobiles and trucks.

This action to set aside the Commission's order and for a temporary restraining order and for interlocutory and permanent injunction against issuance of the permits authorized thereby, was brought under the provisions of § 205(g) of the Interstate Commerce Act [49 U.S.C.A. § 305(g)], § 10 of the Administrative Procedure Act [5 U.S.C.A. § 1009], and §§ 1336, 1398, 2284, and 2321 to 2325 of the Judicial Code [28 U.S.C.A. §§ 1336, 1398, 2284, and 2321–2325]. The plaintiffs' motion for a temporary restraining order was denied after hearing. On November 24, 1958, permits for the operations authorized by the order were issued by the Commission. The prayer for injunction was thereafter abandoned, and the cause is now before this statutory three-judge court for a determination on the merits.

The plaintiffs American Trucking Associations, Inc., The Contract Carrier Conference of American Trucking Associations, Inc., and National Automobile Transporters Association are motor carrier trade associations. The plaintiffs Convoy Company, Robertson Truck-A-Ways, Inc., Western Auto Transports, Inc., and Kenosha Auto Transport Corp., are motor common carriers authorized to operate in one or more of the states affected by the extensions of Pacific Motor Trucking Company's contract operations authorized by the order. Robertson holds common carrier authority to transport automobiles and trucks, in initial movements, in truckaway service from the General Motors plants at Raymer and South Gate to points in Arizona, Nevada, and Oregon. The plaintiffs Hadley Auto Transport and B & H Truckaway are motor contract carriers. Hadley is authorized to transport in initial movements, in truckaway service, automobiles from points in Los Angeles County, California, which includes Raymer and South Gate, to points in Idaho and Montana, and from Oakland to points in Arizona, and automobiles and trucks from points in Los Angeles County to points in Arizona, Nevada, New Mexico, and Utah. B & H is authorized to transport automobiles, in truckaway and driveway service, in initial movements, from Vernon, California, an incorporated community just outside Los Angeles, to points in Arizona and Nevada, and motor vehicles, except trailers, in initial movements from Vernon to points in Utah, Idaho, Oregon, and Washington, serving Raymer as a point within the Vernon commercial zone.

The United States and the Interstate Commerce Commission were named defendants. The United States was represented at the hearing on the motion for a temporary restraining order, and thereafter an answer was filed on its behalf stating:

"* * * the United States does not participate in the defense of the Commission's order but does not oppose its defense." [1]

There has been no further participation by the United States in the proceedings.

Pacific Motor Trucking Company and General Motors Corporation sought leave to intervene on behalf of the defendants.

Their requests were granted, PMT, the applicant, and GM, the sole shipper in-

---

1. This is of particular significance in view of the fact that the United States on occasion has seen fit to oppose actively orders of the Interstate Commerce Commission.

volved, being the parties who would be most affected if the Commission's order should be set aside.

The question presented by this action is, to summarize, whether the Commission erred in authorizing extension of PMT's existing contract carrier authority to serve a single shipper, GM, and to transport a single commodity, new automobiles and trucks, from three GM plants in California to points within five western states which are stations on the rail lines of PMT's parent railroad, SP.

The plaintiffs challenge the order, contending the Commission erred in the following respects:

"1. It ignored the provisions of the National Transportation Policy applicable in proceedings of the type under consideration;

"2. It ignored the mandate of the proviso of § 5(2) (b) [of the Interstate Commerce Act] which it must observe in cases of this kind except where special circumstances, not here present, justify an exception to the Congressional policy against performance of unrestricted truck service by railroads or their affiliates;

"3. It failed to follow its own precedent cases and failed to conform to decisions of the Supreme Court applicable to the proceedings under review;

"4. It failed to conform to the Congressional policy manifested by

§ 210 of the Interstate Commerce Act against dual operations."

■ Counsel for both sides agree as to the scope of judicial review permitted in such a case as this, namely, that an order of an independent body such as the Interstate Commerce Commission is not to be disturbed if the order is within the scope of the statute which the Commission is authorized to administer and enforce, and is based upon adequate findings, which are supported by substantial evidence in the record. Counsel also recognize that this is so even though the court should disagree with the Commission's conclusion, since the Act is not rigid and confides broad discretion in the Commission. It is, therefore, the function and duty of this court to determine whether the order here under consideration comes within the prescribed legal limits.

Plaintiffs differ with the defendant Commission and the intervenors, PMT and GM, as to what are the statutory limits of the Commission's authority applicable to granting of contract carrier authority to a motor carrier which is the wholly owned subsidiary of a railway.

■ The basic statute which governs the issuance of motor contract carrier permits is § 209(b) of the Interstate Commerce Act [49 U.S.C.A. § 309(b)], as amended by the Act of August 22, 1957, Pub.Law 85-163, 71 Stat. 411.[2] Section 209(b) in terms provides that issuance of such permits shall be subject to the lim-

2. "209(b) Applications for such permits shall be made to the Commission in writing, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission may, by regulations, require. Subject to section 310 of this title, a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful require-

ments, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in the Interstate Commerce Act; otherwise such application shall be denied. In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect which denying the permit

itation on issuance of dual contract and common carrier authority contained in § 210 of the Act [49 U.S.C.A. § 310]. Further, the Act must be read as a whole and the various sections interpreted and applied in the light of the national transportation policy[3] and the policy underlying § 5(2) (b) [49 U.S.C.A. § 5(2) (b)].[4] It is not questioned that PMT's past operations for GM, as well as the extended operations authorized by the order, are those of a contract carrier by motor vehicle, as defined by § 203(a) (15), as amended August 22, 1957 [49 U.S.C.A. § 303(a) (15)].[5] Nor is there any question that the Commission had authority under § 209(b) to issue permits for the extended contract carrier operations, unless such permits to PMT, as a subsidiary of SP, were in violation of some other statutory provision.

The plaintiffs admit that there is no express provision prohibiting this grant of authority to PMT, but contend that

would have upon the applicant and/or its shipper and the changing character of that shipper's requirements. The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof, and it shall attach to it at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations, consistent with the character of the holder as a contract carrier, including terms, conditions and limitations respecting the person or persons and the number or class thereof for which the contract carrier may perform transportation service, as may be necessary to assure that the business is that of a contract carrier and within the scope of the permit, and to carry out with respect to the operation of such carrier the requirements established by the Commission under section 204(a) (2) and (6); *Provided,* That within the scope of the permit and any terms, conditions or limitations attached thereto, the carrier shall have the right to substitute or add to its equipment and facilities as the development of its business may require: *Provided further,* That no terms, conditions or limitations shall be imposed in any permit issued on or before the effective date of this proviso which shall restrict the right of the carrier to substitute similar contracts within the scope of such permit; or to add contracts within the scope of such permit unless upon investigation on its own motion or petition of an interested carrier the Commission shall find that the scope of the additional operations of the carrier is not confined to those of a contract carrier as defined in section 203(a) (15), as in force on and after the effective date of this proviso."

3. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; —all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." Act of Sept. 18, 1940, c. 722, Title I, § 1, 54 Stat. 899, 49 U.S.C.A. note preceding section 301.

4. American Trucking Associations, Inc. v. United States, 1957, 355 U.S. 141, 151–152, 78 S.Ct. 165, 2 L.Ed.2d 158.

5. "(15) The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this section and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

the grant to a wholly owned motor carrier subsidiary of a railroad of "unrestricted" authority to engage in common carrier operations in competition with independent motor carriers, is contrary to the public interest and national transportation policy as heretofore applied by the Commission and interpreted by decisions of the courts, including the Supreme Court.

 The first question which must be resolved is therefore: How is § 209(b) to be interpreted in the public interest and in the light of the national transportation policy? Section 209(b) in terms provides:

> " * * * In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements."

The plaintiffs in their brief contended that this amendment of § 209(b) "has no bearing on the issues" in the instant case. During the oral argument counsel for plaintiffs admitted that this amendment of the statute was in effect and binding on the Commission at the time it issued the order complained of, but argued that it had no application to the factual situation involved in the order here under consideration. Plaintiffs argued that the legislative history of this provision shows that the reason for its adoption was to nullify the decision of the Supreme Court in United States v. Contract Steel Carriers, Inc., 350 U.S. 409, 412, 76 S.Ct. 461, 100 L.Ed. 482, approving the right of contract carriers to seek new business to an extent that the carrier might become a common carrier in fact, remaining a contract carrier in name only. The effect of the court decision was remedied by a second sentence inserted in § 209(b)

by the 1957 amendment; and whatever may have been the original reason for instituting the legislation which culminated in the 1957 amendment, § 209(b), as it read at the time the Commission issued this order, clearly directed consideration by the Commission of certain specific criteria in applying public interest and the national transportation policy to authorization of contract carrier permits.

The order here challenged shows on its face that the Commission did consider those criteria, making findings with respect to each of them.

As to the number of shippers to be served by the applicant and the nature of the service proposed, the Commission found the evidence established that PMT's sole purpose was to afford GM extended driveaway and truckaway transportation of new cars and trucks from GM's plants at Oakland, Raymer, and South Gate, California, and that PMT's equipment was to be assigned to the exclusive use of that shipper.

As to the effect of granting the permit upon the services of protesting carriers, both rail and motor, the Commission made detailed findings as to the amount of GM traffic theretofore handled, or not handled, by the protesting carriers, both rail and motor. Careful consideration was given to the probable loss of GM traffic by rail carriers in joint-line service with SP, if authority were granted to PMT to serve points beyond SP's line, and the probable loss to a motor carrier presently serving GM dealers in Washington and Alaska, if PMT should be authorized to operate within the State of Washington. The Commission also weighed the effect on other independent motor carriers, both common and contract, authorized to serve any of the areas affected by the proposed extension of authority. It found that Hadley, one of the two protesting contract carriers, was dedicated to serving Ford, GM's largest competitor, that B & H, the other protesting contract carrier, possessed limited authority for operations from Vernon, California, and had in the past served Studebaker-Packard, and that

Robertson, a common carrier protestant, transported vehicles principally for Chrysler.

As to the effect denial of the permit would have upon the applicant and the shipper and the changing character of the shipper's requirements, the Commission found that the shipper, GM, had established its need for extension of the personalized type of contract service which PMT had been rendering it, and rendering well, from other points for many years; that in view of the limited storage facilities maintained by GM at its plants, transportation service must be closely coordinated with plant operations to avoid congestion or delay in deliveries to dealers; that use of any other carrier would require outgoing shipments to be dispatched through the shipper's incoming gate, causing confusion and disarranging the operations at the plant, which are geared to use of PMT's services from its nearby yard. The proposed extension of service was supported by GM in order to obtain faster transportation on shipments requiring expedited handling, direct deliveries to dealers at off-rail points, more flexible and expeditious handling of consolidated shipments, and to meet the competition of other automobile manufacturers, notably Ford and Chrysler, which have motor services available. The Commission further found that, should the requested authority be denied, GM had indicated it would not use the services of the protesting motor carriers, but either would support an application for similar authority by an independent motor contract carrier presently serving a GM branch plant at Arlington, Texas, or would institute proprietary operations. The order further shows that denial of the permit would cause substantial damage to the applicant, PMT, which has dedicated its contract carrier service to GM operations for many years, acquiring special equipment to meet GM's needs, and that PMT's contract carrier operations for GM during the years 1953 through the first eleven months of 1956 averaged 86.35% of PMT's total contract carrier operations. Thus, although the Commission found an "absence of unusual conditions" which would justify the issuance of permits for service to points not on SP's rail line, there was, in the court's opinion, substantial evidence of special circumstances justifying the extensions of PMT's contract carrier authority to serve GM.

■ All of the Commission's findings and conclusions are supported by substantial evidence in the record before it.

The plaintiffs contend that any grant of contract carrier authority to a motor carrier subsidiary of a railroad must be limited to operations which are "auxiliary or supplemental" to the rail operations, the test applied by the Commission in permitting unification, merger, or acquisition of control of a motor carrier by a railroad under § 5(2) (b); that such authority must be limited further by the five restrictions generally applied by the Commission, in the absence of special circumstances, in granting common carrier authority under § 207, 49 U.S C.A. § 307, to a motor carrier subsidiary of a railroad; and that such authority is subject to the prohibition against dual common and contract carrier authority under § 210.

The Commission denies that the limitations which it has administratively adopted in applying § 207 and § 5(2) (b) are applicable to the issuance of contract carrier permits under § 209, pointing out that it has already been determined in the American Trucking Associations case, supra, 355 U.S. at pages 149–150, 78 S.Ct. at pages 170–171, that § 5(2) (b) is not a rigid limitation upon issuance of common carrier permits under § 207, although the Act is to be read as a whole and the Commission properly considered the underlying policy of § 5(2) (b) as a "guiding light" in the exercise of its discretion under § 207. The Commission points out further that to apply to a § 209(b) contract carrier permit the five restrictions generally placed upon a § 207 common carrier certificate in the case of a motor carrier subsidiary of a railroad, would convert the contract carrier into a common carrier, and that the § 210 ban on dual operations applies to

common and contract carriage by the same motor carrier or affiliated motor carriers, and does not deal with dual operations by a railway and its motor carrier subsidiary.

The Commission concedes that the rationale which requires a reading of the Act as a whole and consideration of the policy underlying § 5(2) (b) as a guiding light in the issuance of § 207 common carrier certificates is equally applicable to the granting of § 209(b) permits for contract carrier operations. It contends that it did apply, insofar as practicable in dealing with an application for contract carrier authority, the policies underlying § 5(2) (b), § 207, and § 210, as well as the specific criteria laid down by the Congress in its 1957 amendment of § 209(b) for determining whether issuance of a contract carrier permit is consistent with the public interest and the national transportation policy.

That the Commission did apply the Act as a whole, giving effect to the policies underlying §§ 5(2) (b), 207, and 210, as well as carefully following the guide laid down by the Congress in § 209(b) for determining public interest and compliance with the national transportation

policy, is borne out not only by the findings of fact recited in the Commission's order, but by its conclusions as to the scope of extended operations which would be in the public interest, and by the curtailed authority which the Commission granted.[6] It will be observed that the requested authority was denied where it would encroach upon existing service by other carriers, and granted where the evidence of record showed that the proposed extension would have little or no effect upon present and future operations of the protestants.

True, the authority granted PMT by the Commission's order was not subject to all five of the restrictions which the Commission has generally, in the absence of special circumstances, seen fit to impose on *common* carrier certificates to motor carriers which are railway affiliates. The extended operations authorized, however—far from being "unrestricted" operations by PMT in the contract carrier field, as the plaintiffs have consistently referred to them—were restricted in many respects. The authority granted was limited to points already served by SP (so as not to affect adversely other railroads carrying GM traf-

6. "* * * We deem it of controlling significance here that in the territory under consideration automobiles are commodities which can be economically and advantageously transported by rail to on-rail points, and that the nature of the movements from these three California plants is such as to render it unlikely that a significant amount of freight would be diverted from Southern Pacific to its motor contract carrier subsidiary if the proposed service were limited to Southern Pacific points. It does not appear that the amount of traffic likely to be diverted under these conditions would be large enough to afford either Southern Pacific or applicant an unfair competitive advantage over other carriers or to constitute a destructive competitive threat to other automobile producers. On the other hand, use by General Motors of applicant's proposed service on a Statewide basis would permit Southern Pacific to invade the territory served by other rail lines and by the existing motor carriers and would inevitably result in the diversion of a large percentage if not all of the traffic now moving in rail joint-line service.

Such eventuality has in no way been justified and the public interest in forestalling it is apparent. * * * insofar as Southern Pacific points are concerned, the authority sought represents no more than a request by Southern Pacific to perform truck transportation, albeit contract-carrier transportation, to the same points it serves as a rail carrier. * * * it is clear that all of the traffic except that moving on government bills of lading is now originated by Southern Pacific, and that regardless of whether the Sub 37 application is granted or denied, as concerns rail points of the Southern Pacific, there will be little or no diversion to the existing independent motor operators. In other words, a grant of authority to applicant to serve only those points which are stations on the lines of Southern Pacific should not result in any appreciable alteration of the existing competitive situation and should not unduly restrain competition or in any degree adversely affect the operations of other carriers." I.C.C. Order, Sheets 23–25.

fic beyond SP to other rail points), and limited to points on the rail line of SP (so as not to cut in on territory which potentially might be served by independent motor carrier protestants), subject to the condition that "the permits authorizing such operations should be issued upon receipt of a written request from applicant for the imposition of a restriction against the transportation of automobiles and trucks" in its outstanding common carrier certificates (in the interest of avoiding the possibility of dual motor carrier operations), and the further condition "that there may from time to time in the future be attached to the permits granted such reasonable terms, conditions and limitations as the public interest and national transportation policy may require."

■ The court finds that the Commission's order violates no statutory prohibition, either in letter or in spirit, and that the authority granted thereby to PMT is in the public interest and in keeping with the national transportation policy, affording the shipper adequate, economical, and efficient service in a specialized field, and at the same time effecting no encroachment on the operations of other carriers or transportation media. Thus, the court finds without merit plaintiffs' allegations of error numbered 1, 2, and 4.

As to the plaintiffs' third allegation of error, that the Commission failed to follow its own precedent cases and failed to conform to decisions of the Supreme Court applicable to the proceedings under review, the plaintiffs have pointed to no case determinative of the particular question here involved. Most of the cases cited deal with orders under § 5(2) (b) or § 207 and administrative practice in interpreting and applying those sections. At the argument, plaintiffs relied principally on the Supreme Court's decisions in United States v. Rock Island Motor Transit Company, 1951, 340 U.S. 419, 71 S.Ct. 382, 385, 95 L.Ed. 391, and American Trucking Associations, Inc., v. United States, 1957, 355 U.S. 141, 78 S. Ct. 165, 2 L.Ed.2d 158, affirming D.C.,

144 F.Supp. 365. In both cases the Supreme Court upheld the Commission's administrative interpretation and application of § 207 in the light of the policies underlying the Interstate Commerce Act as a whole and the national transportation policy. In the Rock Island case, the Court approved the Commission's imposition of five restrictions administratively adopted to insure that common carrier operations by a railway affiliate under a § 207 certificate would be "auxiliary and supplemental" to the rail operations in the absence of special circumstances justifying broader authority in the public interest, holding that the modification was authorized by the Commission's reservation, in the original § 207 certificate, of power to impose such further restrictions as subsequently might appear necessary. In the American Trucking Associations case the Court merely held that the Commission, in granting a § 207 common carrier certificate, had correctly given consideration to the policy underlying § 5(2) (b), although the latter section did not constitute a rigid limitation on § 207 certificates. The court finds the Commission's order in the instant case in harmony with the rulings in those cases.

For the foregoing reasons, the court concludes that the Commission in authorizing the extended operations by PMT acted within the limits of its statutory authority and did not exercise its discretion arbitrarily or capriciously; hence, the Commission's order must be upheld on the merits.

The intervenors have raised a further question, namely, the standing of the plaintiffs to bring this action. The intervenors contend that the complaint shows upon its face that none of the association plaintiffs is a "party in interest" authorized by § 205(g) of the Interstate Commerce Act [49 U.S.C.A. § 305(g)] to seek judicial review, or the equivalent "person suffering legal wrong because of any agency action" within § 10 of the Administrative Procedure Act [5 U.S.C.A. § 1009] and, further, that the complaint fails to include any alle-

gation and there is an absence of proof that the motor carrier plaintiffs have suffered or are threatened with damage or financial injury as the result of the Commission's order, so as to make them parties in interest entitled to bring suit. The intervenors urge that neither mere concern for obedience to law nor the mere possibility of stronger competition by virtue of the grant of new operating authority is sufficient to give the plaintiffs standing to bring this action to set aside the Commission's order, and that to constitute a "party in interest" under § 205 (g) a plaintiff must show that some definite legal right possessed by him has been directly damaged or seriously threatened by the order. Atchison, Topeka & Santa Fe Railway Co. v. United States, D.C., 130 F.Supp. 76, affirmed *per curiam* 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785. They point out further that the fact that the plaintiffs were permitted to intervene before the Commission does not alone furnish a basis for plaintiffs' required "interest". Pittsburgh & W. V. R. Co. v. United States, 1930, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980.

The defendant Interstate Commerce Commission did not raise the issue of standing, and the question was argued by the intervenors after the court had heard the case on the merits.

■ A majority of the court find that the association plaintiffs obviously are not persons possessed of some legal right directly and adversely affected by the administrative action, entitling them to bring an action to set aside the Commission's order. The majority further find that, not only is the complaint devoid of any allegation of direct injury, present or threatened, to the motor carrier plaintiffs by granting of the extension of operating authority to PMT, but, at the hearing on the merits, there was no showing of actual or anticipated direct injury such as would entitle them to institute this action. Had the complaint been filed by some qualified "party in interest," all of the plaintiffs would have had the right to intervene under the provisions of 28 U.S.C. § 2323;[7] but the right to intervene presupposes the existence of an action brought by a proper plaintiff. Since none of the plaintiffs has alleged or shown standing to bring the action under the statutes providing for judicial review of the Commission's orders, it is the view of Judges KEECH and CURRAN that the complaint must be dismissed on the further ground that plaintiffs lack standing to sue.

Judge BASTIAN concurs in so much of this opinion as deals with dismissal of the complaint on the merits.

Counsel will present an appropriate order dismissing the complaint (1) on the merits and (2) for lack of standing to sue.

---

7. 28 U.S.C. § 2323, third paragraph:
 "Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission, or in any action commenced under the aforesaid sections [section 2321 of Title 28 and sections 20, 23, and 43 of Title 49] may intervene in said action at any time after commencement thereof."