**B-H TRANSFER COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**American Trucking Associations, Inc., et al., Intervenors.**

**Civ. A. Nos. 2917 and 2918.**

United States District Court,
M. D. Georgia,
Macon Division.

July 18, 1974.

Wallace Miller, Jr., Jones, Cork, Miller & Benton, Macon, Ga., J. Raymond Clark, Ephraim & Clark, Washington, D. C., for plaintiff in Nos. 2918 and 2917.

William J. Schloth, U. S. Atty., M. D. of Ga., Macon, Ga., Fritz R. Kahn, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendants in 2918.

Ronald T. Knight, Asst. U. S. Atty., M. D. of Ga., Macon, Ga., for defendants in 2917.

R. J. Reynolds, III, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Brown Transport Corp. and American Trucking Assoc., Inc.

Peter T. Beardsley, Nelson J. Cooney, Brenda P. Murray, Washington, D. C., for American Trucking Associations, Inc., intervening defendant.

John P. Carlton, Bishop, Carlton & Sweeney, Birmingham, Ala., Fritz R. Kahn, Gen. Counsel, Betty Jo Christian, Interstate Commerce Commission, Washington, D. C., Robert H. Bork, U. S.

Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for defendants in 2917.

Before BELL, Circuit Judge, BOOTLE, Senior District Judge, and OWENS, District Judge.

OWENS, District Judge:

These two cases are actions to set aside Interstate Commerce Commission orders denying two June 28, 1972, applications filed by the plaintiff B–H Transfer Co., a wholly-owned railroad subsidiary, for permanent, unrestricted authority to transport commodities in interstate commerce by motor vehicle. This district court of three judges was constituted as required by law. 28 U.S. C. § 2325.[1] The cases were consolidated for hearing and decision.

In Civil Action 2917, the clay case, plaintiff seeks to overturn a decision of the Interstate Commerce Commission which denied plaintiff permanent authority to haul clay in containers from Washington County, Georgia, to the ports of Savannah, Georgia, Charleston, South Carolina, and Port Royal, South Carolina (see map, Exhibit "A"), and to haul empty containers in return. The complaint named the United States of America and the Interstate Commerce Commission as defendants. The American Trucking Associations, Inc., Brown Transport Corp., and Bowman Transportation, Inc., have intervened on behalf of the defendants.

In Civil Action 2918, the plaintiff seeks to overturn the commission's decision which denied the plaintiff permanent authority to haul loaded and empty semi-trailers between Washington County and various rail loading ramps in Georgia, limited to traffic having a prior or subsequent movement by rail on flat car, commonly known as piggy-back service. Brown Transport Corp. has intervened in this case as a party defendant.

Plaintiff is a Georgia corporation chartered June 9, 1971. It is a wholly-owned subsidary of the Sandersville Railroad Company, an independent, locally owned short-line railroad the tracks of which are all located in Washington County, Georgia, extending approximately nine miles from Kaolin via Sandersville to Tennille where they connect with tracks of the Central of Georgia Railroad Company, a part of the Southern Railway System.

The verified statement of Hugh M. Tarbutton, Vice-President of Sandersville Railroad Company and Chairman of the Board of Directors of plaintiff, states:

"The Sandersville [Railroad Company] originates and terminates substantial volumes of traffic on its lines, primarily outbound clay, pulpwood and wood chips, and inbound chemicals and other materials used by the industries located on our line. In order to better serve the clay industry, the Sandersville owns a substantial fleet of railroad hopper-car equipment, and operates additional such equipment under lease. There are 7 clay plants served by the Sandersville at Kaolin and Sandersville which process and ship clay in all forms, dry bulk, slurry, bags and containers to customers throughout the United States and abroad.

\*   \*   \*   \*   \*   \*

"At the time that we established our motor carrier subsidiary, B–H Transfer Co., it was recognized that B–H would require a substantial infusion of funds from the Sandersville in order to get it launched. The Sandersville Railroad Company has provided those funds and is prepared to provide such additional funds in the future as may be necessary to enable B–H to provide both its existing au-

---

1. Title 28 U.S.C. § 2325 provides: "An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

thorized intrastate service, interstate service, and the additional proposed service that is the subject of the application of B–H in this proceeding. The accompanying financial statement should be convincing of the ability of the Sandersville to make such advances to B–H.

"B–H was formed by the Sandersville in recognition of the fact that shippers and receivers of Washington County traffic do not have available to them *complete service* by all forms of transportation. We are very much in favor of *integrated intermodal service offering all options to shippers* to improve their transportation service. Because of its years of close coordination with the Washington County clay industry, I am convinced that the *Sandersville-B-H management is uniquely capable of providing the complete and specialized service that is required by that industry.*

"The Sandersville has made every effort to keep pace with improved transportation services and techniques. It is particularly aware of the growing attractiveness and importance of the container mode of transportation for clay. Indeed, *jointly with the Southern Railway System, we pioneered the movement of bagged clay in 20-foot steamship containers in August 1971.* In our opinion, the growth of this traffic has not even approached its potential. With approval of the B–H application, container shipments, as well as the more conventional bulk and slurry shipments, can be moved by that mode that best meets the shipper's requirements. Sandersville had no other objective in mind in undertaking to provide through its motor subsidiary, a complete service to shippers." Clay case—Verified Statement No. 2 (emphasis added).

Plaintiff operates under intrastate authority granted by the Georgia Public Service Commission and temporary authority [2] granted by the Interstate Commerce Commission on June 5, 1972.

The Commission dealt with each of the applications for permanent authority under its modified procedure, a practice under which the parties present their respective cases by written affidavits rather than live testimony. The court has before it a copy of the record of the Commission's proceedings in each case as well as the pleadings and briefs filed in this court.

These cases were heard on December 14, 1973, at which time the parties argued their respective contentions. Briefs have been received; the entire record has been considered, and the cases are ready for decision.

## I. Scope of Review

The scope of judicial review of these cases is set out in 5 U.S.C. § 706 [3] and

---

2. 49 U.S.C. § 310a(a) provides: "To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be. Such temporary authority, unless suspended or revoked for good cause, shall be valid for such time as the Commission shall specify, but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter."

3. Title 5 U.S.C. § 706 provides: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall —

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

has been defined by the Supreme Court as follows:

"The function of the reviewing court . . . is *limited* to *ascertaining whether there is warrant in the law and the facts for what the Commission has done*. Unless in some specific respect there has been *prejudicial departure* from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has *support in the record and the applicable law*." United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821, 835 (1946). (Emphasis added).

██ Prerequisite to such a review by this court is evidence in the record that the parties were heard on the issues,

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

4. 49 U.S.C. § 307 provides:

"(a) Subject to section 310 of this title, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed serv-

that the proper standards were applied and that a judgment was in fact made. Gilbertsville Trucking Co. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L. Ed.2d 177 (1962).

Thus, the fundamental question before this court in each of these cases is whether there is a legal and factual basis in the record for the orders of the Commission.

## II. *Substantive Law*

The Interstate Commerce Commission is empowered to issue a certificate of public convenience and necessity if it finds that the applicant is fit to perform the service and that the proposed service "is or will be required by the present or future public convenience and necessity." Title 49 U.S.C. § 307.[4]

There is no express statutory restriction on the issuance of certificates to a subsidiary of a railroad. However, a statute does restrict the acquisition of trucking companies by railroads. 49 U.S.C. § 5(2)(b).[5] Furthermore, the

ice, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied: *Provided, however,* That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini,. except as such carriers may be authorized· to engage in special or charter operations.

Certificate not to confer proprietary or property rights in highway·

"(b) No certificate issued under this chapter shall confer any proprietary or property rights in the use of the public highways."

5. The statute provides in part: "Whenever a transaction is proposed under subdivision (a) of this paragraph, the carrier or carriers or person seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants (and, in case carriers by motor vehicle are involved, the persons specified in section 305(e) of this title), and shall afford reasonable opportunity for interested parties to be heard. If the Com-

preamble to the Interstate Commerce Act expresses the desire of Congress that competition between motor carriers and railroads be maintained. 54 Stat. 899 (1940).[6] The Commission has developed policy which limits the circumstances under which rail-affiliated motor carriers like plaintiff may be granted certificates of public convenience and necessity, and its policy has been approved by the Supreme Court. American Trucking Associations v. United States, 355 U.S. 141, 78 S.Ct. 165, 2 L. Ed.2d 158 (1957) (The first *A.T.A.* case) ; United States v. Rock Island Motor Transit Co., 340, U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951).

Under the Commission's policy, applications by railroad affiliates for motor carrier certificates are classified as requests for either restricted ·or unrestricted authority. Restricted authority certificates allow a railroad affiliate to provide motor carrier service which is auxiliary or supplemental to its parent's rail service. These certificates are granted upon a showing of public convenience and necessity. Unrestricted authority certificates allow a railroad affiliate to provide motor carrier service beyond the scope of its parent's rail service.

■ The Commission will not grant a railroad affiliate an unrestricted author-

ity certificate unless in addition to the normal public convenience and necessity requirements, "special circumstances" are found to exist. *American Trucking Ass'ns, supra,* 355 U.S. at 151, 78 S.Ct. 165 at 171, 2 L.Ed.2d at 165. The plaintiff in these two cases applied for unrestricted authority certificates.

The Commission has summarized its "special circumstances" practice as follows:

"This policy [of imposing auxiliary and supplementary restrictions] was and is sound and should be relaxed only where the circumstances clearly establish (1) that the grant of authority has not resulted and probably will not result in the undue restraint of competition, and (2) that the public interest requires the proposed operation, which the authorized independent motor carriers have not furnished, except where it suited their convenience." *Id.* n. 10.

Subsequent to the first *A.T.A.* case, the Supreme Court reviewed the special circumstances test in the context of the entire Interstate Commerce Act and in light of that Act's legislative history. American Trucking Ass'ns v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L. Ed.2d 1527 (1960) (the second *A.T.A.* case). The court held as a matter of law that because of the National Trans-

mission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: *Provided,* That if a carrier by railroad subject to this chapter, or any person which is controlled by such a carrier, or affiliated

therewith within the meaning of paragraph (6) of this section, is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

6. This preamble, known as the *National Transportation Policy,* provides in part that it is the :
    ". . . policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of the Act, so administered as to recognize and preserve the inherent advantages of each." 54 Stat. 899 (1940). 49 U.S.C. ante § 1.

portation Policy the Commission could not grant motor carrier certificates to rail affiliates unless an express finding that independent motor carriers were "unable or unwilling to perform the same type of service", was made by the Commission. *Id.*, 364 U.S. at 14, 80 S. Ct. at 1578, 4 L.Ed.2d at 1537.

To the suggestion that restrictions to auxiliary or supplemental service would be incompatible with Pacific Motor's application in the second *A.T.A.* case, the Supreme Court stated, and in view of plaintiff's suggestion to the Commission and this court that the National Transportation Policy should not apply to this small railroad, it is noted that the Supreme Court stated:

> ". . . Assuming that the restrictions which would limit Pacific Motor's operations to an auxiliary and supplemental service would also be incompatible with a contract carrier operation, and that the Commission was consequently powerless to impose those restrictions, this alone does not, in our view, meet the 'special circumstances' test. There is, for example, no finding that independent contract carriers were unable or unwilling to perform the same type of service as Pacific Motor. In such a situation we do not believe that the policy of the Act allows the Commission to authorize service by Pacific Motor, limited only to points on the Southern Pacific line, *simply because General Motors wants a contract carrier operation.* If that desire of General Motors, in combination with the policy of the Act, disables a railroad subsidiary from obtaining the business, that is simply the result of the National Transportation Policy. This consequence, we believe, does not meet the compelling public interest standard established by American Transportation Associations. A contrary conclusion would open the door to approval of over-the-road contract trucking by railroad subsidiaries to most, if not virtually all, major destinations, and hence

would greatly attenuate the safeguards which have been painstakingly erected to prevent railroad domination of trucking. Appellees say that these safeguards are no longer needed, because independent trucking is no longer an 'infant industry.' This is an immaterial argument in this forum. We do not condemn the wisdom of the Commission's action. We simply say that the transportation legislation does, and that *the pardoning power in this case belongs to Congress."* *Id.*, 364 U.S. at 14, 80 S.Ct. at 1579, 4 L.Ed.2d at 1536 (emphasis added).

### III.  *Commission's Orders*

A.  The Piggy-back Case—Civil Action No. 2918.

■  Plaintiff's application was for permanent authority to haul semi-trailers (a) from and to Washington County, and (b) various trailer rail loading ramps in the State of Georgia. There is no such loading ramp on the line of plaintiff's parent Sandersville Railroad Company. The verified statement of Hugh M. Tarbutton, Vice President of plaintiff's parent and Chairman of plaintiff's Board of Directors, submitted with plaintiff's application, states:

> "B–H was formed by the Sandersville in recognition of the fact that shippers and receivers of Washington County traffic do not have available to them complete service by all forms of transportation. Ramp-to-ramp railroad TOFC service which has grown substantially throughout the country in recent years, is not presently available in Washington County, Ga. This fact is not the result of any failure on the part of the Sandersville to provide such service. On the basis of inquiries from our shippers and receivers, we have carefully investigated the feasibility of providing a TOFC ramp on the line of The Sandersville Railroad Company. The Sandersville is fully prepared to construct and maintain such a ramp and to offer di-

rect TOFC service. This cannot be accomplished, however, without the cooperation of the Southern Railway System, which connects with the Sandersville. Joint rates and through routes with the Southern obviously cannot be established without the concurrence of all connecting carriers.

"We have had a number of discussions with the appropriate officers of the Southern Railway System in an effort to establish TOFC service to and from the Sandersville. Summarizing these discussions, on September 6, 1972 I wrote to Mr. R. S. Hamilton, Executive Vice President of the Southern, urging that the Southern join with the Sandersville in establishing FAK Plan II½ and Plan III TOFC rates to and from a ramp that we would establish at Sandersville, Ga. on our line. By letter dated September 20, 1972, Mr. Hamilton advised us that the Southern Railway System 'can't agree to establish TOFC rates from Sandersville Railroad origins for reasons given' at our earlier meetings.

"Under these circumstances, it is obvious that the only method of providing Washington County shippers and receivers with TOFC service is to make available connecting motor carrier service to and from railroad ramps at other nearby locations. This integrated intermodal service which B–H seeks authority to provide would, therefore, be in the nature of substituted railroad service. It would substitute not for TOFC service that the Sandersville is providing, but for TOFC service that the Sandersville is unable to provide because of the nonconcurrence of its only connection. Accordingly, we view the application of B–H as the only means whereby our Washington County shippers and receivers can have available to them TOFC service, and we earnestly solicit the commission's approval of the application." (Verified Statement No. 2 of H. M. Tarbutton, No. MC–135809 (Sub-No. 3) pp. 2–4).

According to the verified statement of plaintiff's President H. M. Williams, Jr., plaintiff anticipates serving between Washington County and the following rail loading ramps:

(1) *Macon* which is about 60 miles due west—access to Southern Railway and Seaboard Coast Line ramps

(2) *Augusta* which is about 60 miles northeasterly—access to Southern Railway and Seaboard Coast Line ramps

(3) *Dublin* which is about twenty-five miles south—access to Seaboard Coast Line ramp

(4) *Thomson* which is about 40 miles northeasterly—access to Georgia Railroad ramp

(5) *Atlanta* which is about 120 miles northwest—access to Southern Railway, Seaboard Coast Line, Georgia Railroad and Louisville and Nashville ramps

The Commission found "that applicant has failed to establish that the present or future public convenience and necessity require the proposed operation . . . and that the application should be denied."

In reaching this conclusion the Commission found, among other things, the following facts:

(a) "applicant is a wholly-owned subsidiary of the Sandersville Railroad Company . . ."

(b) "the evidence of shippers, while indicating a general desire to use applicant's proposed service, is somewhat general and vague regarding actual tonnage to be tendered applicant . . ."

(c) "that protestant [Brown Transport] serves rail TOFC facilities at Athens, Atlanta, Augusta, Macon, Savannah, Statesboro, and Waynesboro, Ga. (which are most of the TOFC locations noted by supporting shippers) . . . ; that while protestant's applicable tariff does not include such service to a TOFC facility at Thom-

son, Ga., protestant is ready and willing to amend its tariff accordingly; that protestant has served the supporting shippers on single and joint-line bases . . . and that protestant maintains a terminal at Milledgeville [some 28 miles away]."

An examination of the record reveals that these factual findings are based not only upon the record but upon record facts as to which there is no dispute. The court notes particularly that of the six verified statements submitted by supporting shippers, four of those have never used or attempted to use the "piggy-back" service; one now uses but doesn't like to use Central of Georgia Motor Transport Company for its approximately five trailer loads per month piggy-back moves—its first choice would be a ramp on the Sandersville Railroad; and one now ships 2–5 percent of its outbound load by piggy-back but would ship more if complete service were available—present service is inadequate because of lack of a local ramp. None of these even mentioned the services of Brown Transport; neither did any of them (or plaintiff) even contend that independent motor carriers were "unable or unwilling to perform the same type of service" as the second *A.T.A.* case requires.

The legal reasons for the denial by the Commission were:

(d) " . . . protestant's status . . . [obviously as a railroad subsidiary]"

(e) " . . . general nature of the evidence . . . "

(f) " . . . in keeping with the Commission's principle that existing carriers should normally be accorded the right to transport all shipments which lie within the ambit of their authority and which can be handled economically and efficiently without the authorization of a new, competitive service . . . "

(g) that the proposed service is neither auxiliary to or supplemental of the rail service of plaintiff's parent and would in effect confer upon plaintiff's parent authority it does not have; "accordingly, absent proof of 'special circumstances', commission policy further precludes a grant herein, Pacific Motor Trucking Co. Extension—Automobiles, 89 M.C.C. 645 (1962) . . . " [the same carrier in second *A.T.A.* case].

The Commission has thus concluded that the plaintiff railroad subsidiary has failed to prove by evidence that the proposed service is required by present or future public convenience and necessity. The Commission thus properly exercised its discretion, Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), because obviously plaintiff in its application failed to prove present or future need. The Commission could have stopped at this point but instead it gave additional legal reasons for the exercise of its discretion, to wit: (i) existing carriers if they can economically and efficiently transport all proposed shipments should be accorded the right to do so without the authorization of the new additional competition; and (ii) that nevertheless, applicant does not meet the "special circumstances" test that it as a rail subsidiary must meet.

As to (i) "the adequacy or inadequacy of existing service is a basic ingredient in the determination of public convenience and necessity, but it is not and may not be used as the sole test . . . See Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S. Ct. 173, 2 L.Ed.2d 117 (1957); Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.C.N.H.1964)." Feature Film Service, Inc. v. United States, 349 F.Supp. 191, 201 (S.D.Ind.1972). The Commission properly considered this factor and likewise properly did not rest its decision solely on this point. Proceeding to (ii), even though it is mentioned last it is obviously not least because applicant even if it satisfied all other criteria, still had to meet the "special circumstances" test. Like in the

second *A.T.A.* case applicant at most showed that the supporting shippers would like to have its service. That is not sufficient. Applicant failed to prove "special circumstances", and the Commission properly so concluded.

There is a factual and legal basis for the Commission's decision to deny plaintiff's "piggy-back" application, and the decision is therefore affirmed.

B. The Clay Case—Civil Action No. 2917

██ As shown by the already quoted portion of the verified statement of Hugh M. Tarbutton, Sandersville Railroad Company jointly with the Southern Railway System pioneered in the movement of bagged clay in containers in August 1971. On June 5, 1972, plaintiff was granted its temporary authority by the Commission to transport clay and clay slurry and empty cargo containers from and to (a) Washington County and (b) Chatham County, Georgia, and Charleston, North Charleston and Port Royal, South Carolina, restricted to traffic having a subsequent movement by water. According to the verified statement of plaintiff's President H. M. Williams, Jr. between the grant of temporary authority on June 5 and the following November 24, the plaintiff for three shippers transported 27 movements of containerized clay to the Port of Savannah and one movement to the Port of Charleston; those shippers—Georgia Kaolin Co., Anglo-American Clays Corp. and Burgess Pigment Co. filed verified statements supporting plaintiff's application. The movement of clay in containers is a relatively recent development. Mr. Williams suggested that plaintiff could offer the complete service needed by Washington County shippers "because of (1) our location in the clay-shipping areas, (2) our intrastate clay operations, and (3) the long experience of the management of B–H with the movement of clay by rail." No. MC–135809 (Sub-No. 2), Verified Statement No. 1, p. 12. Mr. Sam H. Lloyd of the Georgia Ports Authority in his verified

statement advised that the Authority dedicated its container handling facility at the Port of Savannah on May 13, 1972.

In concluding "that applicant has failed to establish that the present or future public convenience and necessity require the proposed operation" the Commission first concluded that "the application, *except to the extent that authority is sought to transport clay in cargo containers* to the ports of Savannah, Charleston, and Port Royal, is not supported by evidence sufficient to establish a prima facie case for certification." (emphasis added). Plaintiffs do not contend that the Commission erred in so concluding, and it is therefore unnecessary for this court to examine the factual or legal basis thereof. Plaintiffs, however, do contend that the Commission erred in the remainder of its findings.

The Commission next stated:

"Concerning the proposal to transport clay in cargo containers from Sandersville to Savannah, Charleston, and Port Royal, evidence in support has been adduced from three shippers of export traffic and other parties involved with such movements. This evidence indicates that a sizeable amount of containerized clay is now being shipped by rail to these three ports and that a smaller amount of traffic is transported by motor vehicle. Shipments which must be expedited to meet ship departure schedules and traffic consisting of lots of less than three containers can be transported more efficiently and economically by motor vehicle. Protestant Bowman is authorized to provide the required service to each of three ports, and protestant Brown is authorized to serve Savannah. Each of these protestants appears able and willing to handle the traffic now moving. Nonetheless, it also appears that large increases in containerized traffic are expected and that while most of the traffic will continue to be transported by rail, the increases in

traffic requiring motor vehicle service will also be significant. Such evidence tends to indicate a need for the additional services proposed but, in the circumstances present herein, even if we assume that applicant has satisfied the normal burden of proof for establishing a future need, we are still constrained to deny the application." Report of the Commission decided March 21, 1973, pp. 8 and 9.

While this is not the clearest of statements, the Commission thus concluded:

(a) Evidence adduced from three shippers indicates a small amount of containerized clay traffic is now transported by motor vehicle.

(b) Expedited shipments and shipments of less than three containers can more efficiently and economically be transported by motor vehicle.

(c) Protestants Bowman and Brown are authorized, able and willing to handle present motor vehicle shipments.

(d) Significant increases in containerized traffic moving by motor vehicle are expected. This tends to indicate a need for applicants services.

(e) Nevertheless, even if there is a future need for applicant's services, we are still constrained to deny the application.

Conclusions (a) through (d) are unquestionably findings of fact. This court's examination of the record causes it to conclude that these findings are fully supported by the record evidence.

Conclusion (e) is a legal conclusion. It is explained by the remainder of the Commission's order in which the Commission says:

(i) "Applicant is a subsidiary of a railroad."

(ii) "Applicant . . . is not seeking to provide a service which can fairly be characterized as auxiliary to or supplemental to the rail service of the parent company . . ." since "the destination points . . . are beyond the service points of the par-

ent railroad . . . ." and since (the Commission in effect says) the proposed service would be superior to and competitive with rail service as to expedited and small lot movements. "Accordingly, the transportation services proposed herein appear essentially unrelated to rail service."

(iii) Applicant as a railroad subsidiary seeking authority that is not auxiliary or supplemental to its parents rail operations must also show that special circumstances exist.

(iv) "the only evidence that applicant has brought forth toward these ends is the general assertion that inasmuch as the parent company is a relatively small railroad, the likelihood of an undue restraint of competition is remote."

(v) Protestants are able and willing to currently handle the traffic.

(vi) "We cannot find that applicant has satisfied its burden of proof."

While the Commission's order does not explicitly say so, it cites American Trucking Ass'n v. United States, 364 U. S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), which is the second *A.T.A.* case, and thus states that applicant's burden as a rail affiliate is to show "special circumstances" one of which is that independent motor carriers are "unable or unwilling to perform the same type of service." *Id.* 364 U.S. at 14, 80 S.Ct. at 1578, 4 L.Ed.2d at 1537. As the record plainly demonstrates, plaintiff produced no evidence showing special circumstances including in particular that any existing carrier is or has been unable or unwilling to perform the same type of service. The Commission therefore properly concluded that applicant failed to satisfy its burden of proof.

The remainder of the Commission's findings preceding this conclusion are in accordance with the facts in the record and the substantive law as heretofore set out.

■■ This court, like the Commission, has taken note of plaintiff's argu-

ment that the National Transportation Policy being incompatible with and not tailored to the operation of its parent nine-mile short-line railroad company, should not be applied to its case. As appealing as that argument is, it is the responsibility of the Commission and of this court to enforce but not to change the National Transportation Policy. Be the railroad big or small, there is but one National Transportation Policy. It was properly applied—factually and legally—by the Commission. " . . . The pardoning power . . . belongs to Congress." *American Trucking Ass'ns, supra,* 364 U.S. at 14, 80 S.Ct. at 1579, 4 L.Ed.2d at 1536.

The decision denying plaintiff's application in the clay case is therefore affirmed.

BELL, Circuit Judge (dissenting):

I respectfully dissent. In my view the Commission fell into an error of law in its consideration of these matters. The error arose in the application of the so-called National Transportation Policy to prevent railroad domination of the trucking industry. United States v. Rock Island Motor Transit Company, 1951, 340 U.S. 419, 71 S.Ct. 382, 95 L. Ed. 391. The general rule of that case as developed by the Commission from the statutes, 49 U.S.C.A. §§ 5(2)(b), 307(a), and by the Supreme Court in subsequent cases, American Trucking Association, Inc. v. United States, 1957, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158, American Trucking Associations, Inc. v. United States, 1960, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527, is to restrict railroads in performing motor carrier operations to auxiliary or supplementary service to rail operations. But, and this is the point—there is an exception to the general rule. As Justice Clark said for the court in the first *American Trucking Associations* case, 355 U.S. at 150, 78 S.Ct. at 170:

" . . . While [the Commission] has applied auxiliary and supplementary restrictions in many § 207 pro-

ceedings, the Commission has occasionally issued certificates to railroad subsidiaries without the restrictions where 'special circumstances' prevail, namely, where unrestricted operations by the rail-owned carrier are found on specific facts and circumstances to be in the public interest."

The record is replete with supplications that the Commission address itself to the "special circumstances" aspects of this case. Although the parameters of "special circumstances" have not been drawn, the Supreme Court did approve an unrestricted motor carrier certificate in the first *American Trucking Associations* case, supra, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158, for a railroad subsidiary by treating a finding of public interest as a sufficient "special circumstances."

Here the evidence goes much further. Applicant is operating under a temporary certificate granted by the Commission. The statutory prerequisite to the grant was "an immediate and urgent need . . . within a territory having no carrier service capable of meeting such need . . ." 49 U.S.C.A. § 310a(a). The business developed under the temporary authority proved this to be the case. Applicant also has intrastate operating rights. The piggyback service was not available to shippers on the parent railroad because the only interconnecting rail carrier refused to cooperate in providing the service. The only motor carrier service available was at higher rates and was not available at all necessary points. The Commission, in the *Clay* case, found a need for additional service, and that no undue restraint would ensue from the grant of the authority.

These facts and findings are background for the error in law made by the Commission and adopted by the majority here. The error is in the Commission having applied its auxiliary and supplementary service rule to applicant as a rigid limitation rather than following its normal policy of determining whether the exception is warranted. *American*

*Trucking Association,* 355 U.S. at 150, 78 S.Ct. 165. This treatment of applicant is difficult to understand. Given the nine-mile short line status of applicant's parent, the auxiliary and supplementary service rule amounts to a complete bar of motor carrier service. The rule in question rested originally on reason but the reasoning is absent in the case here and thus the rule should be inapplicable or, at least, of little weight.

That the Commission may have been in doubt in its approach is indicated by the finding that the chances of undue restraint on competition from a grant of the application in the *Clay* case were remote.

What apparently happened in this erroneous proceeding in the Commission is now mirrored by the majority here. All emphasis is on the National Transportation Policy which, as stated by the Commission and the majority of this court, is in essence, to protect existing modes of transportation by dividing territories and business. The public interest, however, is and must be an overriding unspoken premise in this National Transportation Policy and a prime factor in public interest is service to the shipper. My impression of these cases is that the shippers on the nine-mile parent railroad have been overlooked in the Commission's effort to maintain the status quo.

I would remand for further proceedings in the Commission directed to considering each case free of the rigid application of the auxiliary and supplementary service rule.