AMERICAN TRUCKING ASSOCIATIONS, INC.,
ET AL. *v.* UNITED STATES ET AL.

No. 6.   Argued October 23, 1957.—Decided December 9, 1957.*

---

*Together with No. 8, *Railway Labor Executives' Association et al.* v. *United States et al.*, also on appeal from the same court.

*Peter T. Beardsley* argued the cause for appellants in No. 6. On the brief were *Mr. Beardsley* for the American Trucking Associations, Inc., *Roland Rice* and *Albert B. Rosenbaum* for the Regular Common Carrier Conference of A. T. A., and *Stephen Robinson* and *Rex H. Fowler* for certain Motor Carriers.

*Edward J. Hickey, Jr.* argued the cause for appellants in No. 8. With him on the brief were *Clarence M. Mulholland* and *James L. Highsaw, Jr.*

*Robert W. Ginnane* argued the cause and filed a brief for the Interstate Commerce Commission, appellee in Nos. 6 and 8.

*Alden B. Howland* argued the cause for the Rock Island Motor Transit Co., appellee. With him on the brief were *Arthur L. Winn, Jr.* and *John H. Martin.*

*Paul Ahlers* filed a brief for the Iowa State Commerce Commission, appellee in Nos. 6 and 8.

*D. C. Nolan* filed a brief for Traffic Bureaus et al., appellees.

*John S. Burchmore* and *Robert N. Burchmore* filed a brief for the National Industrial Traffic League, as *amicus curiae,* in No. 6.

Mr. Justice Clark delivered the opinion of the Court.

These appeals involve, among subsidiary issues, the basic question of whether the Interstate Commerce Commission in a proceeding under § 207 (a)[1] of the Interstate Commerce Act, wherein a railroad subsidiary seeks a certificate permitting it to provide ordinary motor carrier service at or near the parent railroad's line, is required by § 5 (2)(b) [2] of the Act and the National Transportation

---

[1] "Sec. 207. (a) Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . ." 49 Stat. 551, 49 U. S. C. § 307 (a).

[2] Sec. 5 (2)(b) ". . . If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it

Policy to restrict such motor carrier service to that which is auxiliary to, or supplemental of, the parent railroad's services. A three-judge District Court sitting in the District of Columbia upheld the action of the Commission in issuing a certificate without such restrictions. 144 F. Supp. 365. We agree with the conclusion of the District Court that under the circumstances of this case the action of the Commission was well founded.

At the time we noted probable jurisdiction of the appeals, 352 U. S. 816 (1956), counsel in No. 8 were invited to discuss the issue of appellants' standing to sue. None of the parties now question that standing, and our examination of § 17 (11)[3] and § 205 (h)[4] of the Act leads us to conclude that appellants may properly bring this action. See *Brotherhood of Railroad Trainmen* v. *Baltimore & O. R. Co.,* 331 U. S. 519 (1947).

In 1938 the Commission authorized Rock Island Motor Transit, a wholly owned subsidiary of the Chicago, Rock Island and Pacific Railroad, to purchase the property and operating rights of the White Line Motor Freight Company, between Silvis, Illinois, and Omaha, Nebraska. 5 M. C. C. 451. The operating certificate, issued in 1941, restricted Motor Transit to service to or from points on

shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: *Provided,* That if a carrier by railroad subject to this part, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6), is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." 54 Stat. 906, 49 U. S. C. § 5 (2)(b).

[3] 54 Stat. 916, 49 U. S. C. § 17 (11).

[4] 49 Stat. 550, as amended, 54 Stat. 922, 49 U. S. C. § 305 (h).

the Rock Island Railroad, subject to any further restrictions the Commission might impose "to insure that the service shall be auxiliary or supplementary to the train service. . . ." No. MC–29130. Three years later the Commission allowed Motor Transit to purchase property and operating rights of the Frederickson Lines, covering routes between Atlantic, Iowa, and Omaha. 39 M. C. C. 824. Prior to issuing an operating certificate for the Frederickson routes, however, the Commission reopened both proceedings and imposed five conditions on Motor Transit's operation over the combined routes.[5]

Although Motor Transit succeeded in its efforts to have this order set aside by a three-judge District Court, 90 F. Supp. 516, we upheld on appeal the power of the Commission to impose the conditions, and reversed the order of the District Court. *United States* v. *Rock Island Motor Transit Co.,* 340 U. S. 419 (1951). Pursuant to

[5] "1. The service to be performed by The Rock Island Transit Company shall be limited to service which is auxiliary to, or supplemental of, train service of The Chicago, Rock Island and Pacific Railway Company, hereinafter called the Railway.

"2. The Rock Island Motor Transit Company shall not render any service to, or from or interchange traffic at any point not a station on a rail line of the Railway.

"3. No shipments shall be transported by The Rock Island Motor Transit Company between any of the following points, or through, or to, or from, more than one of said points: Omaha, Nebr., Des Moines, Iowa, and collectively Davenport and Bettendorf and Rock Island, Moline, and East Moline, Ill.

"4. All contractual arrangements between the Rock Island Motor Transit Company and the Railway shall be reported to use [*sic*] and shall be subject to revision, if and as we find it to be necessary in order that such arrangements shall be fair and equitable to the parties.

"5. Such further specific conditions as we, in the future, may find it necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, train service." 40 M. C. C. 457, 477.

our holding, a certificate was issued in September 1951, containing the restrictions as originally ordered.[6]

Soon thereafter Motor Transit filed with the Commission the present application for a certification of unrestricted operations. Authority was requested to serve the points along the White Line and Frederickson routes as well as certain off-line points, all of which parallel generally the lines of the parent railroad between Chicago and Omaha. The application was substantially granted in November 1954.[7] 63 M. C. C. 91. Operations were authorized, free of the prior conditions, between Silvis, Illinois, and Omaha. The application was denied insofar as it sought authority between Silvis and Chicago; the Commission pointed out that Motor Transit already possessed such authority.

The order was attacked in the District Court by American Trucking Associations, Inc., its Regular Common Carrier Conference, and nine motor carriers—all appellants in No. 6. The Railway Labor Executives' Asso-

---

[6] Prior to this date, temporary operating authority was granted Motor Transit over the White Line and Frederickson routes with three restrictions:

1. No service to be performed for shipments originating at Chicago, Ill., or Omaha, Nebr., and destined to either of said points.

2. No shipment to be transported between any of the following points or through, or to, or from more than one of said points: Omaha, and collectively Davenport and Bettendorf, Iowa, Rock Island, Moline and East Moline, Ill.

3. No single shipment to be handled on motor carrier billing weighing more than 2,000 pounds.

[7] Two conditions were imposed: "(1) that there may be attached from time to time to the privileges granted herein such reasonable terms, conditions, and limitations as the public convenience and necessity may require, and (2) that all contractual arrangements between [Motor Transit] and [Rock Island] shall be reported to us and shall be subject to revision, if and as we find it to be necessary in order that such arrangements shall be fair and equitable to the parties . . . ." 63 M. C. C., at 109.

ciation and two organizations which since have become members thereof—all of whom are appellants in No. 8— intervened in opposition to the order. Answers were filed by the United States and the Commission. Intervenors in support of the order included Motor Transit, a committee of its employees, the Iowa State Commerce Commission, and numerous Chambers of Commerce and shipper organizations. These appeals were taken from the order of the District Court upholding the certificate as granted.

Appellants advance three reasons why the order should be stricken. They say, in general, that the Commission is required not only in acquisition proceedings under § 5 (2) (b) but also in certification proceedings under § 207 to limit service by a rail-owned motor carrier to that which is auxiliary to or supplemental of the rail service of its parent; that the Commission is without power to void restrictions previously imposed in acquisition proceedings on the subterfuge of a subsequent § 207 application; and, even if such contentions have no validity, that the evidence was insufficient and the findings inadequate to support the certification order of the Commission.

I.

By § 5 (2) (b), which was formerly § 213 (a) (1) of the Motor Carrier Act of 1935, 49 Stat. 555, the Congress authorized consolidation, merger, acquisition, or lease of carriers if found by the Commission to be "consistent with the public interest." However, in transactions involving a motor carrier where a railroad or its affiliate is an applicant, the Congress directed the Commission "not [to] enter such an order unless it finds that the transaction proposed" not only is in the public interest but "will enable such [railroad] carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." The Commission has

interpreted this mandate of the Congress to confine acquisition of a motor carrier by a railroad or its affiliate to "operations . . . which are auxiliary or supplementary to train service." [8] We specifically approved this long administrative practice in *United States* v. *Rock Island Motor Transit Co., supra.* It will be remembered that the acquisitions of the White Line and Frederickson routes by Motor Transit, wherein "auxiliary or supplemental" restrictions were imposed, were pursuant to this section of the Act.

The present proceedings, however, were instituted under § 206 *et seq.* of the Act, which involve applications for certificates of public convenience and necessity. Motor Transit had been carrying on scheduled peddle operations over the entire White Line and Frederickson routes regardless of the volume of traffic available. By this application it sought to secure a certificate covering the same general routes without the restrictions imposed in the § 5 (2)(b) proceedings. Such a certificate would enable it to haul, *inter alia,* the more profitable truckload traffic, thus supplementing the expensive peddle service. [9]

---

[8] *Pa. Truck Lines—Control—Barker,* 1 M. C. C. 101, supplemented, 5. M. C. C. 9, 11; see, *e. g., Gulf Transport Co.—Purchase—Crane,* 35 M. C. C. 699; *Pacific Motor Trucking Co.—Purchase—Keithly,* 15 M. C. C. 427; *Texas & P. Motor Transport Co.—Purchase— Southern Transp. Co.,* 5 M. C. C. 653.

[9] In contrast to "truckload traffic," which refers to starting with a full load and delivering at one destination, the term "peddle traffic" refers to starting with a full load and delivering at various destination points, or the converse, picking up parts of a load at various points and delivering at a single destination. Because Motor Transit is exclusively licensed over the routes in question by the Iowa State Commerce Commission, all intrastate traffic will go to Motor Transit regardless of the outcome of the present proceeding. In addition, all rail-billed traffic will go to Motor Transit as a matter of course. Therefore, only two kinds of traffic are actually involved in this case, interstate truckload and interstate peddle traffic proceeding on a motor bill of lading.

Section 207, which defines the showing on which issuance of a certificate of public convenience and necessity is predicated, makes no reference to the phrase "service . . . in its operations" used in § 5 (2)(b), nor is there any language even suggesting a mandatory limitation to service which is auxiliary or supplementary.

The legislative history of the Motor Carrier Act of 1935 gives no indication that § 213 (a)(1), the predecessor of § 5 (2)(b), was to be considered a limitation on applications under § 207. Congressional debate was largely confined to the subject of acquisitions, and no reference to railroad operation of motor carriers appears in either of the Committee Reports. S. Rep. No. 482, H. R. Rep. No. 1645, 74th Cong., 1st Sess. Certain amendments were proposed in 1938, including one by Senator Shipstead which would have added to § 207 the same language which in § 213 (a) of the Motor Carrier Act and § 5 (2)(b) of the Interstate Commerce Act had been construed as a limitation to auxiliary or supplementary service. The Senator withdrew his amendment after Commissioner Eastman of the Interstate Commerce Commission expressed the view that "in interpreting and applying the provisions of section 207 (a) . . . the Commission should read the act as a whole and take cognizance of this policy" of restricting certificates to auxiliary or supplementary service. See Hearings before Senate Committee on Interstate Commerce on S. 3606, 75th Cong., 3d Sess., pp. 26–30, 141–142.

In interpreting § 207, the Commission has accepted the policy of § 5 (2)(b) as a guiding light, not as a rigid limitation. While it has applied auxiliary and supplementary restrictions in many § 207 proceedings, the Commission has occasionally issued certificates to railroad subsidiaries without the restrictions where "special circumstances" prevail, namely, where unrestricted operations by the rail-owned carrier are found on specific facts

and circumstances to be in the public interest.[10] At least three of these cases had been decided when the Congress extensively revised the Interstate Commerce Act by enactment of the Transportation Act of 1940, 54 Stat. 898, in which § 213 of the Motor Carrier Act was substantially re-enacted into § 5 (2)(b) of the Interstate Commerce Act, while § 207 (a) was left unchanged.

We conclude, therefore, that the Congress did not intend the rigid requirement of § 5 (2)(b) to be considered as a limitation on certificates issued under § 207.

---

[10] For cases where restrictions have been applied in § 207 cases, see, *e. g., Kansas City S. Transport Co., Com. Car. Application,* 10 M. C. C. 221, 28 M. C. C. 5; *Chicago, M., St. P. & P. R. Co. Extension—Milwaukee Division,* 53 M. C. C. 341; *Frisco Transportation Co. Extension—Springfield Airport,* 47 M. C. C. 63; *Great Northern R. Co. Extension—Hobson—Lewistown,* 19 M. C. C. 745; *Texas & P. Motor Transport Co. Extension—Big Spring—Pecos, Tex.,* 14 M. C. C. 649.

For cases where certificates were issued under § 207 without restrictions, see, *e. g., Burlington Truck Lines Extension—Iowa,* 48 M. C. C. 516; *Rock Island Motor Transit Extension—Wellman, Iowa,* 31 M. C. C. 643; *Burlington Transportation Co. Extension—Council Bluffs—Weldon—Kansas City,* 28 M. C. C. 783; *Santa Fe Trail Stages, Inc., Com. Car. Application,* 21 M. C. C. 725; *Interstate Transit Lines Extension—Verdon, Neb.,* 10 M. C. C. 665; *St. Andrews Bay Transportation Co. Extension,* 3 M. C. C. 711.

In the instant case the Commission summarized its practice:

"This policy [of imposing auxiliary and supplementary restrictions] was and is sound and should be relaxed only where the circumstances clearly establish (1) that the grant of authority has not resulted and probably will not result in the undue restraint of competition, and (2) that the public interest requires the proposed operation, which the authorized independent motor carriers have not furnished, except where it suited their convenience.

.    .    .    .    .

"The findings hereinafter made . . . do not establish a precedent. Each case of this character must be determined upon the facts and circumstances disclosed by the evidence." 63 M. C. C. 91, 102, 108.

Nor is this contrary to our holding in *United States* v. *Rock Island Motor Transit Co., supra,* an acquisition case in which the Court also discussed Commission policy under § 207. We pointed out that "[r]ail affiliates have been permitted to leave the line of the railroad to serve communities without other transportation service. Those divergences, however, are an exercise of the discretionary and supervisory power with which Congress has endowed the Commission." 340 U. S., at 442. We found that the Commission's purpose was to apply the National Transportation Policy so as "to preserve the inherent advantages of motor-carrier service." In discussing this practice we quoted at page 428 from the opinion of the Commission in that case, which stated the test in this language:

> "In other words, a railroad applicant for authority to operate as a common carrier by motor vehicle, though required to do no more than prove, as any other applicant, that its service is required by public convenience and necessity, has a special burden . . . by reason of the very circumstance that it is a railroad. Where it fails to show special circumstances negativing any disadvantage to the public from this fact, a grant of authority to supply motor service other than service auxiliary to and supplemental of train service is not justified." 40 M. C. C. 457, 474.

In *United States* v. *Texas & Pacific Motor Transport Co.,* 340 U. S. 450 (1951), decided on the same day as *Rock Island,* we upheld the Commission's imposition of restrictions in a § 207 case. In *Texas & Pacific,* however, the proceeding involved the power of the Commission to impose the restrictions, a question not before us here.

We repeat, as was said in those cases, that the underlying policy of § 5 (2)(b) must not be divorced from proceedings for new certificates under § 207. Indeed, the

Commission must take "cognizance" of the National Transportation Policy and apply the Act "as a whole." But, for reasons we have stated, we do not believe that the Commission acts beyond its statutory authority when in the public interest it occasionally departs from the auxiliary and supplementary limitations in a § 207 proceeding.

## II.

We find no indications that the Commission has permitted the § 207 proceedings in this case to be used as a device to evade § 5 (2)(b) restrictions. Certificate proceedings under § 207 are separate and distinct from acquisition proceedings, although the same general policy governs both. If the public interest requires that a § 207 certificate be issued to a rail-owned carrier without restriction, we find no authority for denying the Commission power to grant the same simply because the carrier just emerged from a § 5 (2)(b) proceeding. Moreover, the approval here was expressly subject to the Commission's continuing examination of the activity of Motor Transit with a view of placing limitations on its operations if found necessary in the public interest. A further condition makes all contractual arrangements between Motor Transit and its parent subject to revision by the Commission.

Finally, if under our interpretation a "loophole" exists in the Act, the Commission has shown no inclination to permit its use as such. Should the Commission prove to be less stringent in the future, appellants not only have recourse to the Congress, but also to the courts for review of the Commission's finding that "special circumstances" exist.

## III.

Appellants' last contention relates to the sufficiency of the evidence to support the Commission's finding of

public convenience and necessity. Appellants concede that public need may be found for peddle traffic between the smaller points along the routes, but contest the findings of public need for unrestricted service between such major points as Davenport, Cedar Rapids, Des Moines, and Council Bluffs, Iowa, and Omaha, Nebraska.

The evidence before the Commission was such that we are not inclined to disturb the findings. Approval of the application was urged by the Iowa State Commerce Commission, 149 shippers and receivers, 8 motor carriers who interline traffic with Motor Transit (including some members of appellant Motor Trucking Association), and several Chambers of Commerce and commercial organizations. There was evidence of a serious need for less-than-truckload peddle service: other carriers frequently failed to handle such traffic, and gave service inferior to that of Motor Transit when they did operate. There was testimony that the weight and key-point limitations operated to make even the Motor Transit service less than adequate. It appeared that the peddle traffic alone was not profitable, and that if confined to it Motor Transit could no longer render the caliber of peddle service it had maintained prior to the imposition of the temporary restrictions. Further, there was evidence that 11 points would be totally without peddle service if the auxiliary and supplemental restrictions were applied. Apart from the effect of restricted operations on peddle service, the record indicates that other carriers sometimes had been reluctant to accept even truckloads in certain low-rated commodities.

This evidence leaves us unwilling to suggest that public convenience and necessity could only be advanced by confining Motor Transit to service of the smaller communities, while leaving the more profitable business to others. Public need for Motor Transit's operation in truckload traffic to some extent can be grounded on the

need for its operation in peddle traffic, since economic justification for carrying on a costly peddle operation depends on combining it with a more lucrative truckload operation. While it is true that railroads were not allowed to enter the motor trucking industry primarily to build an independently profitable trucking operation, there is no foundation in the Interstate Commerce Act for so construing § 207 as to require that any railroad operation in the motor trucking field be unprofitable. Observance of economic realities in ascertaining public need is no less due a rail-owned motor carrier than an independent motor carrier.

If, as appellants fear, the unrestricted operations are destructive of competition or otherwise detrimental to the public interest, we believe the situation would not be without remedy. The Commission has retained jurisdiction "to impose in the future whatever restrictions or conditions, if any, appear necessary in the public interest by reason of material changes in conditions or circumstances surrounding applicant's operations in relation to those of competing motor carriers." 63 M. C. C., at 108. This reservation gives it continuing jurisdiction to make certain that the unlimited certificate issued here does not operate to defeat the National Transportation Policy. *United States* v. *Rock Island Motor Transit Co., supra.*

*Affirmed.*

MR. JUSTICE DOUGLAS dissents.