**AMERICAN TRUCKING ASSOCIA-TIONS, INC., et al., Petitioners,**

**v.**

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.**

**Nos. 81–4389, 83–4039.**

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1984.

Kenneth E. Siegel, American Trucking Assoc., Washington, D.C., for Am. Trucking.

Leroy Hallman, Dallas, Tex., for S.W. Mtr.

Maurice F. Bishop, Birmingham, Ala., for Bowman.

Hugh T. Matthews, Dallas, Tex., for Steere.

Laurence H. Schecker, General Counsel, ICC, Robert B. Nicholson, Antitrust Division, Neil R. Ellis, John J. Powers, III,

Justice Dept., Washington, D.C., for respondents.

Raymond J. Salassi, Jr., New Orleans, La., Lloyd M. Roach, Tyler, Tex., John MacDonald Smith, San Francisco, Cal., for intervenor Pacific Motor Trucking.

Betty Jo Christian, Jessie M. Colgate, Washington, D.C., for intervenors Association of American Railroads.

Richard H. Streeter, Washington, D.C., for Tx. & Northern Ry. Co., Inc. & Lesco Trucking Co.

Robert J. Higgins, Angelo V. Arcadipane, Joan M. Darby, Roslyn Mazer, Robert M. Baptiste, Washington, D.C., for intervenors International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Before GARZA, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

I

In these two consolidated cases, we consider whether the Interstate Commerce Act, as revised by the Motor Carrier Act of 1980 and the Staggers Rail Act of 1980, requires the Interstate Commerce Commission to adhere to its longstanding policy in motor carrier licensing proceedings of generally restricting rail-affiliated motor carriers to operations "auxiliary to or supplemental of" the rail operations of the company, unless the particular rail-affiliated trucking company can demonstrate "special circumstances" that justify an exception to the general rule. We conclude that the revised I.C.A. does not require this singling-out of rail-affiliated motor carriers for especially restrictive treatment in licensing proceedings. We deny the petition to review the Commission's decision to abrogate the old "auxiliary to or supplemental of" general rule and its "special circumstances" exception in licensing proceedings under 49 U.S.C. § 10322. See Ex Parte No. MC–156, *Applications for Motor Carrier Operating Authority by Railroads and Rail Affiliates,* 132 M.C.C. 978 (1982) (C.I. 22). It follows that we deny the petition to review the Commission's granting of unrestricted motor carrier operating authority to Pacific Motor Trucking Company, a rail-affiliated motor carrier, without a finding of "special circumstances." See MC–78786 (Sub-No. 281)F, *Pacific Motor Trucking Company Extension—Nationwide General Commodities* (unpublished).

PMT, a wholly-owned subsidiary of Southern Pacific Transportation Company, a rail carrier, applied for nationwide operating authority for its trucking business. An I.C.C. Review Board granted PMT's application and the Commission confirmed without a finding of special circumstances that would justify the broad grant of operating authority beyond auxiliary-to-rail service. One of the petitions before us to review and set aside the Commission's order followed. During the pendency of our review, the Commission began to reexamine the validity of the special circumstances doctrine in light of the 1980 amendments to the I.C.A. A panel of this court heard PMT's petition, but, citing the doctrine of primary jurisdiction, stayed proceedings until the Commission ruled. *American Trucking Associations, Inc., v. I.C.C.,* 682 F.2d 487 (5th Cir. 1982). The Commission decided that a rail-affiliated trucking company no longer needs to prove special circumstances to justify an unrestricted grant of authority, and the other petition before us followed. ATA accepts that we ought to uphold PMT's grant if we uphold the Commission's decision to no longer apply the special circumstances doctrine in licensing proceedings. Therefore the only issue before us is whether the I.C.A. requires application of the special circumstances doctrine in all licensing proceedings.

II

Before the Motor Carrier Act of 1935, the trucking

industry was unstable economically, dominated by ease of competitive entry and a fluid rate picture. And as a result, it became overcrowded with small economic units which proved unable to satisfy even

the most minimal standards of safety or financial responsibility. So Congress felt compelled to require authorization for all interstate operations to preserve the motor transportation system from over-competition ....

*American Trucking Ass'ns v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). 'Congress responded by raising barriers to expansion or entry in the trucking industry. The 1935 Act authorized the Commission to issue a certificate of public convenience and necessity to a qualified carrier

> if it is found that the applicant is fit, willing and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules and regulations of the Commission thereunder, and that the proposed service ... will be required by the present or future public convenience and necessity.

Pub.L. No. 74–255, § 207(a), 49 Stat. 551–52 (1935). In *Pan-American Bus Lines* the I.C.C. developed the measures for granting a certificate:

> whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with a new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

1 M.C.C. 190, 203 (1936). Under the traditional approach, burdens of proof of eligibility for a certificate fell on the applicant. *See, e.g., John Novak Contract Carrier Application,* 103 M.C.C. 555 (1967). A certificate became a grant of a franchise protecting motor carriers from threatening competition. *See* Anderson, Jerman & Constantin, *Railroad versus Motor Carrier Viewpoints on Regulatory Issues,* 45 I.C.C.Prac.J. 294, 302–03 (1978). Inadequacy of existing service was the fundamental inquiry in deciding public convenience and necessity, *see, e.g., Southern Kan. Greyhound Lines, Inc.*

*v. United States,* 134 F.Supp. 502, 509–10 (W.D.Mo.1955); *Hudson Transit Lines v. United States,* 82 F.Supp. 153, 157 (S.D.N.Y.1948); an application proposing no transportation services not already available over the lines of existing carriers was ordinarily denied. *See, e.g., Worthen Extension—Cranberries,* 117 M.C.C. 470, 477–78 (1972); *Walter C. Benson Co., Inc., Extension—N.Y., N.J. & Pa.,* 61 M.C.C. 128, 130 (1952). Furthermore, the Commission generally held that a lowering of rates could not be considered in determining whether a proposed service was in the public interest. *Roadway Express, Inc., Extension—Eastern Md. Counties,* 120 M.C.C. 578, 584 (1974); *Southland Produce Co. Contract Carrier Application,* 81 M.C.C. 625, 628 (1959).

Protecting truckers from other truckers was only one part of the regulatory scheme. Protecting motor carriers from railroads rounded out the picture. The Commission stated the anti-railroad rationale in the original decision establishing the general policy in licensing proceedings of imposing auxiliary-to-rail restrictions on rail-affiliated trucking companies:

> [R]ailroad controlled motor carriers might ultimately be able to prevail over independent competitors, not because of any superiority in service or operation, but through their ability to draw upon the financial and other resources of their parent companies, and ... the motor-carrier industry is more likely to develop in inherent strength and efficiency if it continues, as in the past, to remain largely in independent hands.

*Kansas City S. Transport Co., Inc., Com. Car. Application,* 10 M.C.C. 221, 237 (1938).

The statutory footing of the restrictions on rail-affiliated trucking companies was what are now 49 U.S.C. §§ 11344(c), which enacted high barriers to rail companies' *acquisition* of trucking companies, and 10101(a), the National Transportation Policy, containing the statement that one policy was to "recognize and preserve the inherent advantages of each mode of transportation."[1] The language of both continues essentially unchanged into the present Act.

---

1. The predecessors to § 11344(c) were

§ 5(2)(b) of the I.C.A. as amended in 1940, and

The acquisitions section proved to be particularly influential in establishing a policy of protecting trucking from railroads because it explicitly allowed rail carrier acquisition of a motor carrier only if the motor carrier was to operate under auxiliary-to-rail restrictions. In pertinent part, § 11344(c) reads:

[W]hen a rail carrier, or person controlled by or affiliated with a rail carrier, is an applicant and the transportation involves a motor carrier, the commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition.

The phrase, "to use service by motor vehicle in its operations," has been read as expressing a congressional intent that railroads were at least generally not to be allowed to acquire trucking companies unless they were to be used in rail-related activities.[2]

The licensing requirements did not explicitly provide for auxiliary-to-rail restrictions, but nearly from the start the Commission read the restraints of the acquisitions section into its licensing policy. *Kansas City S. Transport Co., Inc., Com. Car. Application,* 10 M.C.C. at 237. The Commission interpreted § 11344(c)'s language to mean, not only that railroads could not acquire, but also that they could not generally operate as unrestricted trucking companies. As part of this reading the Commission also

pointed to the National Transportation Policy's requirement of preserving "the inherent advantages of each mode," under the logic that, without protection against the railroads, the infant trucking industry might not develop to its maximum extent. Railroads objected, but in *I.C.C. v. Parker,* 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945), and later in *United States v. Rock Island Co.,* 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1950), the Supreme Court affirmed the Commission's power to condition a rail-affiliated trucking company's license with auxiliary-to-rail restrictions. In particular, the Court noted that Congress had in 1940 reenacted the "in its operations" language in full knowledge that this language was also being applied in licensing proceedings. *Id.* at 432, 71 S.Ct. at 390. Further, it backed up the Commission's interpretation of the National Transportation Policy, stating that "[c]omplete rail domination was not envisaged as a way to preserve the inherent advantages of each form of transportation." *Id.* at 433, 71 S.Ct. at 390.

The next and predictable chapter in this regulatory history was the Commission's adoption of an exception to its general rule. In *Rock Island Motor Transit Co. Com. Car. Application,* 63 M.C.C. 91 (1954), the Commission first applied the "special circumstances" exception. The Commission held that unrestricted authority could be granted to a rail-affiliated trucking company if the rail-affiliate could prove, (1) the grant would not restrain competition, and, more importantly, (2) the public interest required

§ 213(a) of the Motor Carrier Act of 1935. Section 10101(a)'s predecessors were § 202(a) of the Motor Carrier Act of 1935, and the National Transportation Policy as prefixed to the I.C.A. of 1940, 54 Stat. 899.

**2.** See Commissioner Eastman, Hearings before Subcommittee of the Committee on Interstate Commerce, United States Senate, on S. 3606, 75th Cong., 3d Sess. 23 (1938 hearings to consider amendments to the Motor Carrier Act of 1935):

The reason for that proviso was that at the time when this act was under consideration by your committee, there was a feeling on the part of many that railroads, for example, ought not be permitted to acquire motor carriers at all. It was pointed out, in opposition

to that view, that there were many cases where railroads could use motor vehicles to great advantage in their operations, in substitution for rail service, as many of them are now doing. Many railroad men, for example, feel that the operation of way trains has become obsolete; that the motor vehicle can handle such traffic between small stations much more economically and conveniently than can be done by a way train; and the motor vehicles are being used in that way by many railroads. The same is true of many terminal operations. The motor vehicle is a much more flexible unit than a locomotive switching car, and it can be used to great advantage with great economy in many railroad operations.

the proposed service, which already certified carriers had not offered except where it suited their convenience. *Id.* at 102. Protestants appealed this decision, and in *American Trucking Ass'ns v. United States,* 355 U.S. 141, 149–50, 78 S.Ct. 165, 170–71, 2 L.Ed.2d 158 (1957), the Supreme Court affirmed the Commission's use of the special circumstances exception, stating:

> Section 207 [the licensing section] ... makes no reference to the phrase "service ... in its operations" used in § 5(2)(b) [the acquisitions section], nor is there any language even suggesting a mandatory limitation to service which is auxiliary or supplementary....
>
> The legislative history of the Motor Carrier Act of 1935 gives no indication that § 213(a)(1), the predecessor of § 5(2)(b), was to be considered a limitation on applications under § 207....
>
> In interpreting § 207, the Commission has accepted the policy of § 5(2)(b) as a guiding light, not as a rigid limitation....
>
> We conclude, therefore, that the Congress did not intend the rigid requirement of § 5(2)(b) to be considered as a limitation on certificates issued under § 207.

*Id.* at 149, 78 S.Ct. at 170. Despite this language, the Court reaffirmed that the licensing and acquisitions sections are interpretive brothers. The Court concluded:

> We repeat ... that the underlying policy of § 5(2)(b) must not be divorced from proceedings for new certificates under § 207. Indeed, the Commission must take 'cognizance' of the National Transportation Policy and apply the Act 'as a whole.' But ... we do not believe that the Commission acts beyond its statutory authority when in the public interest it occasionally departs from the auxiliary and supplementary limitations in a § 207 proceeding.

*Id.* at 151–52, 78 S.Ct. at 171.

Three years later the Court struck down a perceived Commission deviation from its use of the special circumstances doctrine. In *American Trucking Ass'ns v. United States,* 364 U.S. 1, 6, 80 S.Ct. 1570, 1574, 4 L.Ed.2d 1527 (1960) (*ATA* II), "[t]he critical issue raised ... [was] whether the Commission exceeded its statutory authority by granting the permits in question to a railroad subsidiary without imposing more stringent limitations than it did." Finding that "[b]oth the Commission and this Court have recognized that Congress has expressed a strong general policy against railroad invasion of the motor field," the Court reversed the Commission's grant of unrestricted authority to a rail-affiliated carrier where the Commission had not found sufficient special circumstances to justify the grant. *Id.* The Court noted that "[t]he Commission long ago concluded that the policy of the transportation legislation requires that the standards of [the acquisitions section] be followed as a general rule in other situations, notably in applications for common carrier certificates of convenience and necessity." *Id.* The Court further stated that "the policy of opposition to railroad incursions into the field of motor carrier service ... has not been implemented merely by way of a more or less unguided suspicion of railroad subsidiaries, but rather has evolved through a series of Commission decisions from embryonic form into a set of reasonably firm, concrete standards." *Id.* at 7, 80 S.Ct. at 1574. As in the case before us, it was argued in *ATA* II that changed conditions in the trucking and railroad industries had obviated the need for the presumption against rail-affiliated trucking companies. Nevertheless, the Court said:

> Appellees say these safeguards [erected to prevent railroad domination of trucking] are no longer needed, because independent trucking is no longer an "infant industry." This is an immaterial argument in this forum. We do not condemn the wisdom of the Commission's action. We simply say that the transportation legislation does, and that the pardoning power in this case belongs to Congress.

*Id.*

### III

We may not set aside the Commission's decision unless it exceeds statutory

authority or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Batterton v. Francis,* 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). Even if an agency's interpretation would not be the one we would adopt if looking at a statute completely afresh, we ordinarily accept that agency's interpretation of its own statute if the interpretation "has a reasonable basis in law." *Aberdeen & Rockfish Railroad Co. v. United States,* 682 F.2d 1092, 1096 (5th Cir.1982), *quoting Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

## IV

█ Petitioners' arguments against the Commission's interpretation are strong. Nevertheless, we are persuaded of the reasonableness of the Commission's position that the new I.C.A., as amended in 1980, permits the abrogation of the special circumstances doctrine in licensing proceedings. We do not say that the new Act requires the Commission to treat rail-affiliated licensing applicants on the same footing as other applicants. We hold that the Commission's decision was permissible as measured by our standard of review.

## V

In a point-counter-point process the parties marshal statutory sections to support their arguments. The basic interpretive conflict nonetheless remains straightforward. The Commission relies on Congress' fundamental shift to a deregulatory policy, as embodied in specific changes in the licensing provisions and in additions to the broad policy statements contained in the Act. The Commission points to Congress' new policy of encouraging "intermodal" transportation, and on changed conditions in the motor carrier and rail industries. Petitioners mainly rely on the retention of the acquisitions section in the same form since 1940, and the retention in the National Transportation Policy of the requirement of preserving the inherent advantages of each mode, to support the contention that the Act still embodies the old anti-railroad

policy in licensing proceedings that these two statutory sections have always been interpreted to require.

Petitioners' strongest argument is that repeal of the special circumstances doctrine in licensing proceedings would fall into the category of a "repeal by implication," and that the Commission's touted statutory changes are not enough to meet the stiff burden finding an implied repeal involves. The argument is that the special circumstances doctrine in licensing proceeding was recognized by the Supreme Court to be statutorily required by the acquisitions section and the National Transportation Policy, and that the recent changes in the I.C.A. do not constitute an "irreconcilable conflict" necessary to find an implied repeal of the statutory requirement. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1983).

This argument has special force because of the broad language quoted above in *ATA* II that "the transportation legislation" required the application of the special circumstances doctrine in that case. Yet the *ATA* II Court was faced not with the Commission's overruling of the special circumstances doctrine in licensing proceedings in general, as here, but rather with only the limited circumstance of the Commission's departure in a single case from its longstanding policy of applying the special circumstances doctrine in licensing proceedings. We cannot find from the Court's opinion its own interpretation that the "in its operations" language of the acquisitions section was in effect also in the licensing section. Scattered phrases in *ATA* II and in the previous Court opinions may be read to indicate that the Court adopted its own interpretation of the I.C.A. as requiring the special circumstances doctrine in licensing. But in no case was the Court's focus clearly on the importance of the distinction between the Court's approval of a Commission interpretation and the Court's adoption of an interpretation themselves. In the face of the Court's clear espousal of a philosophy of according regulatory agencies maximum flexibility, *see American Trucking Associa-*

tions, Inc. v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967), we believe the Court's opinions can most fairly be read as approving the *Commission*'s interpretation of its statute to require that the restrictions of the acquisitions section also be applied in the licensing area, and holding the Commission to this interpretation in all cases in the absence of the Commission's overruling of its policy in general. We do not believe the Supreme Court went as far as to state according to its own interpretation of the I.C.A. that the restrictions of acquisitions proceedings also had to be applied in licensing proceedings.

That the special circumstances doctrine in licensing was not held by the Court to be statutorily required, but rather simply a Court-approved Commission interpretation of its statute, answers petitioners' efforts to require the Commission to demonstrate a repeal by implication. The Commission need not meet the difficult burden of proving that the new I.C.A. provisions present the "irreconcilable conflict" necessary to find a repeal by implication. Instead the Commission must meet the much easier burden necessary to justify a change in a longstanding policy or interpretation by an agency of its statute.

Courts usually accord great weight to longstanding policies and interpretations announced by an agency, closely scrutinizing departure from agency precedent. *See, e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974); *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965).[3] On the other hand, as the Court noted in *American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Rail-*

way Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967),

> [T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretations and overturn past administrative rulings and practices.... Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

Given these principles and in light of the changes in both the industries involved and the I.C.A., we find reasonable the Commission's interpretation of its statute as allowing abandonment of the special circumstances doctrine in licensing proceedings.

### VI

Under the old Act, the focus of the licensing provisions was on protection of already-operating truckers from new competitors. The new Act takes a radically different, deregulatory approach in its licensing provisions. The new licensing section as applied to motor carriers of property retains only the old "fitness" requirement, and further requires only that the applicant prove that the proposed operations "will serve a useful public purpose, responsive to a public demand or need ...." 49 U.S.C.A. § 10922(b)(1)(B) (West Supp.1983). In effect, this language codifies the first *Pan-American* criterion of useful public purpose and deletes the second and third *Pan-American* criteria of determining whether exist-

---

**3.** Petitioners argue that, in addition to the normal weight given to longstanding policies and interpretations, the "doctrine of reenactment" should apply. The argument is that Congress' reenactment of the "in its operations" and "inherent advantages" language after the Commission's establishment of the special circumstances doctrine in licensing proceedings precludes a subsequent change by the Commission. To bring the "doctrine of reenactment" into play, however, Congress must not only be

aware of the agency's interpretation, but must give some affirmative indication of its intent to preclude an agency change in interpretation. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431–32, 75 S.Ct. 473, 476–77, 99 L.Ed. 483 (1955); *Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1380 n. 14 (11th Cir. 1983); *Ass'n of Am. R.R. v. I.C.C.,* 564 F.2d 486, 493 (D.C.Cir.1977). We see no such affirmative indication here.

ing service is sufficient, and whether the proposed service might hurt existing carriers. Further, § 10922 changes the burden of proof in licensing proceedings. It is no longer necessary for the applicant to prove that the proposed operations are consistent with the public convenience and necessity; the burden is now shifted to protestants to prove such operations are "inconsistent with the public convenience and necessity." *Id.* § 10922(b)(1). The statute goes on to direct the Commission not to conclude that the burden on protestants has been satisfied solely by proving "diversion of revenue or traffic from an existing carrier" to be a result of new entry. *Id.* § 10922(b)(2)(B). Furthermore, the House Report specifically disapproved the traditional protectionist philosophy, stating that "increased ... competition will bring about the most efficient and economical delivery of transportation services to the public." *House Comm. on Public Works and Transportation, Report on the Motor Carriage Act of 1980,* H.R.Rep. No. 1069, 96th Cong.2d Sess. 1, 14, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2283, 2296.

Petitioners point out that Congress did not go as far as to *completely* deregulate entry into the trucking business. For example, Congress decided to continue to require individual licensing proceedings, thus overturning the Commission's rulings asserting that the Commission had the power to issue blanket approval of licenses to whole classes of applicants. *See* Senate Comm. on Commerce, Science and Transportation, Report on the Motor Carrier Reform Act of 1980, S.Rep. No. 641, 96th Cong., 2d Sess. 6; H.R.Rep. No. 1069 at 15, *reprinted in* 1980 U.S.C.C.A.N. at 2297. Furthermore, Congress specifically directed the Commission not to go beyond its statutory mandate in its decisionmaking; *see* Pub.L. No. 96–296, § 3(a), 94 Stat. 79, *reproduced at* 49 U.S.C. § 10101 note; H.R. Rep. No. 1069 at 10–11, *reprinted in* 1980 U.S.C.C.A.N. at 2292–93; S.Rep. No. 641 at 23 (1980); 126 Cong.Rec. H 5345 (June 19, 1980); this admonition reflected a concern that the Commission might deregulate more than Congress directed in the revised law.

*See* H.R.Rep. No. 1069 at 97, *reprinted in* 1980 U.S.C.C.A.N. at 2333.

Notwithstanding that Congress did not completely deregulate the trucking industry, the 1980 amendments unquestionably embody a strong new deregulatory philosophy. One of its cornerstones is the Motor Carrier Act's eased entry requirements under the licensing provisions, offering "increased opportunities for new carriers to get into the trucking business and for existing carriers to expand their service." H.R. Rep. No. 1069 at 3, 1980 U.S.C.C.A.N. at 2285. Where Congress has lowered barriers to entry into the trucking industry, we are persuaded that the Commission acted reasonably in concluding that Congress did not nonetheless intend that high barriers should be retained for the railroads alone.

Our conclusion is buttressed by the fact that the old policy requiring auxiliary-to-rail restrictions on rail-affiliated trucking companies has never been ironclad; even in acquisitions proceedings where the "in its operations" language explicitly required some sort of auxiliary-to-rail restrictions, railroads could acquire trucking companies with unrestricted operations under special circumstances. *See American Trucking Ass'ns, Inc. v. United States,* 425 F.Supp. 903 (D.D.C.1975), *aff'd* 425 U.S. 955, 96 S.Ct. 1735, 48 L.Ed.2d 201 (1976). In other words, even under the old protective regulatory scheme there was no automatic, per se exclusion of railroads from unrestricted trucking operations. If there had been such distrust of railroads built into the regulatory policy, the Commission position would be less persuasive. We find it easier than it otherwise would be to affirm the Commission's decision that the exception should now swallow the rule, that "special circumstances" should no longer be so special.

Thus we believe that the Commission was within its authority in abolishing the special circumstances doctrine in licensing proceedings, even if the doctrine survives in acquisitions proceedings. We do not decide whether the "in its operations" language of § 11344(c) may now be given a new mean-

ing. We need not and do not decide the question of whether § 11344(c) still requires the retention of the special circumstances doctrine in acquisitions proceedings.[4] Even if § 11344(c) still demands proof of special circumstances in acquisitions proceedings,[5] we are persuaded that under the revised I.C.A. the acquisitions and licensing sections are not required to be interpreted in tandem.

## VII

We address here petitioners' remaining arguments. They argue that the retention of the requirement in the National Transportation Policy of preserving "the inherent advantages of each mode," which traditionally has buttressed the application of § 11344(c) to licensing proceedings, means that Congress intended to retain the old anti-railroad bias in licensing proceedings. We have already disposed of the argument that under the pre-1980 I.C.A. the "in its operations" and "inherent advantages" provisions mandated the special circumstances doctrine in licensing proceedings. We note further that the broad "inherent advantages" language could be argued to support a pro-railroad position as well as an anti-railroad position. Congress has recognized the change in the relative economic positions of the rail and trucking industries. For example, one House Report notes that earnings by the railroad industry are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvements. *See* Report of the Committee on Conference on S. 1946, Staggers Rail Act of 1980, H.R.Rep. No. 1430, 96th Cong., 2d Sess. 79 (1980). Congress has further decided that a lowering of entry barriers in the trucking industry would help the trucking industry. It is therefore not without reason to believe that the abolition

of the special circumstances doctrine in licensing proceedings might strengthen the trucking industry by improving its competitive environment as well as strengthen the railroads financially—thus preserving "the inherent advantages of each mode." In a real sense a mechanistic continuation of the old approach to preserving the inherent advantages of each in a changing regulatory environment begs the essential question of means.

But, more concretely, another broad policy announced by Congress supports the Commission's action. In both the Motor Carrier Act and the Staggers Rail Act Congress indicated its intention to promote "intermodal" transportation—meaning shipping involving the transfer of goods to and from trucks and railroads. *See* 49 U.S.C.A. §§ 10101(a)(2)(I), 10505(f) (West Supp. 1983). The Commission argues forcefully that the special circumstances doctrine has a "chilling effect" on intermodal operations, deterring industry executives from planning comprehensive new rail-motor strategies because of the long delays involved in leaping the special circumstances hurdle.

Petitioners cite new sections 10505(g), 10322(b)(2), and 11344(e) to support their position. Section 10505(g) states: "the Commission may not exercise its authority under this section [granting the Commission authority to exempt rail carrier transportation from regulation in certain instances] (1) to authorize intermodal ownership that is otherwise prohibited by this title . . . ." As the Commission noted in its opinion, this provision is inapposite for two reasons. First, the Commission has not proposed to exempt rail-affiliated trucking companies from the requirement of participating in individual licensing proceedings. Second, even if this section could be interpreted to

---

**4.** In Ex Parte No. 438, *Acquisition of Motor Carriers by Railroads* (August 17, 1983), the Commission announced its new policy of no longer requiring that special circumstances be shown to justify acquisitions by rail carriers of motor carriers whose operations go beyond auxiliary-to-rail operations.

**5.** Confining the expansion of railroads into the trucking industry by using the special circum-

stances doctrine essentially is a response to antitrust concerns, to fears that the railroads would dominate the trucking industry. Arguably entry by acquisition raises more immediate anti-competitive concerns than licensing because acquisitions may increase concentration in the relevant market, as opposed to the internal expansion of licensing, which may decrease concentration, at least in the short term.

express a broader congressional policy, the policy would be applicable only to acquisitions, not to licensing proceedings that merely permit rail-affiliated trucking companies to expand their operations. *See* 132 M.C.C. at 985–86.

Section 11344(e) expressly requires the Commission to approve an acquisition of a trucking company by a railroad or rail-affiliated carrier under one particular circumstance. The Commission must approve an acquisition made in order to serve shippers located near rail service and motor carrier service incidental to that rail service, where that rail service is provided by a company other than the acquiring company and the services are seriously "impaired." That this section relating only to acquisitions would be unnecessary if the Congress meant to completely abrogate the old special circumstances doctrine in acquisitions and licensing proceedings does not necessarily mean that Congress intended to retain the entire doctrine. We will not "leap from [this] particular authorization to a pervasive prohibition." *American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway Co.,* 387 U.S. 397, 411, 87 S.Ct. 1608, 1616, 18 L.Ed.2d 847 (1967). It is difficult to reason from the circumstance that Congress mandated approval of an acquisition on a given set of facts that it did not otherwise leave to the relevant agency the regulatory discretion to grant approvals in other circumstances.

Petitioners further urge that Congress' failure to exempt trailer-on-flatcar (TOFC) transportation from Commission regulation precludes the abolition of the special circumstances doctrine in licensing proceedings. *See* 126 Cong.Rec. S. 3636 (April 15, 1980). Rather than totally exempting proposed TOFC service from licensing requirements, Congress adopted § 10322(b)(2), which requires expedited treatment of TOFC applications. Petitioners' argument again is misconceived because by abolition of the special circumstances doctrine the Commission did not exempt rail-affiliated motor carriers from meeting licensing requirements; rail-affiliated motor carriers must still come to the Commission to obtain operating authority under 49 U.S.C. § 10922, expedited or not.

Finally, petitioners contend that the Commission is wrong about the relative positions of the trucking and rail industries, and that in reality there is a "compelling need for increased protection of the struggling and depressed trucking industry in comparison to the financially stronger and well-capitalized rail industry." The Commission found that "the relative economic positions of today's truck and rail industries as well as the ability of motor carriage to compete successfully with other forms of transportation undercuts the basic protective rationale for the 'special circumstances' doctrine." 132 M.C.C. at 982. On this fact issue we defer to the Commission.

## VIII

Railroads were the bogeymen of an earlier congressional age. Congress has found that fear of them is no longer justified, and has decided to allow the economy to operate more freely in the trucking industry. We are persuaded that it is not unreasonable in light of the new I.C.A. for the Commission to allow railroads into the fray on the same grounds as any other competitor. We deny the petition to review the Commission's approval of PMT's application, and deny the petition to review the Commission's abolition of the special circumstances doctrine in licensing proceedings.

Petitions to Review and Set Aside are DENIED.