739 F.2d 1373
 TRI-STATE MOTOR TRANSIT CO., and American Trucking
Associations, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
The Denver and Rio Grande Western Railroad Company,
Intervenor/Respondent.
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, Intervenor.
 No. 83-2564.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1984.
Decided Aug. 3, 1984.
 
 Nelson J. Cooney, Gen. Counsel, Kenneth E. Siegel, Atty., Washington, D.C., for Tri-State Motor Transit Co. and American Trucking Associations, Inc.
 Dickstein, Shapiro & Morin, Robert J. Higgins, Angelo V. Arcadipane, Joan M. Darby, Washington, D.C., for Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 Samuel R. Freeman, John S. Walker, Jr., The Denver and Rio Grande Western R. Co., Denver, Colo., John H. Caldwell, Denise M. O'Brien, Hamel & Park, Washington, D.C., for The Denver and Rio Grande Western R. Co.
 J. Paul McGrath, Asst. Atty. Gen., Robert B. Nicholson, John P. Fonte, Attys., Dept. of Justice, Washington, D.C., John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Laurence H. Schecker, Atty., I.C.C., Washington, D.C., for respondents.
 Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.
 LAY, Chief Judge.
 
 
 1
 Tri-State Motor Transit Co. (Tri-State) contested the application before the Interstate Commerce Commission (ICC) of unrestricted motor carrier operations for the Denver and Rio Grande Western Railroad Co. American Trucking Associations, Inc. (ATA) and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) unsuccessfully sought to intervene before the ICC in opposition of the application. Tri-State, ATA, and the Teamsters now ask this court to set aside the ICC's grant to Denver/Rio Grande of unrestricted motor carrier operations. We affirm the order of the ICC.[1]
 
 
 2
 The unrestricted motor carrier operations granted to Denver/Rio Grande allows the railroad to engage in unlimited trucking operations. Historically, the ICC restricted rail-affiliated motor carriers to operations "auxiliary to or supplemental of" the rail operations of the company, unless the particular rail-affiliated trucking company could demonstrate special circumstances justifying an exception to the general rule. This general rule and exception thereto was known as the "special circumstances doctrine," and required that motor carrier operating authority for railroads be restricted to incidental rail service unless unrestricted authority was required to fulfill a compelling public need for service not being offered by independent motor carriers. The purpose of the special circumstances doctrine was to prevent rail domination of motor carrier markets.
 
 
 3
 In 1982 the ICC abrogated the special circumstances doctrine in Ex Parte No. MC-156, Applications for Motor Carrier Operating Authority by Railroads and Rail Affiliates, 132 M.C.C. 978 (1982). This decision was made in light of amendments to the Interstate Commerce Act--the Motor Carrier Act of 1980 and the Staggers Rail Act of 1980. The ICC concluded that, in light of the 1980 amendments, a rail-affiliated trucking company no longer needs to prove special circumstances to justify an unrestricted grant of authority. ATA and the Teamsters unsuccessfully challenged the ICC decision before the Fifth Circuit. American Trucking Associations v. I.C.C., 722 F.2d 1243 (5th Cir.1984). The Fifth Circuit concluded that the ICC was within its authority when it abolished the special circumstances doctrine, noting especially the changes in the trucking and rail industries and the Interstate Commerce Act.
 
 
 4
 On appeal to this court, Tri-State, ATA, and the Teamsters argue that the Interstate Commerce Act precludes the ICC from removing all special limitations on the licensing of railroads to engage in motor transportation. Therefore, contends Tri-State et al., the ICC was without authority to remove the special circumstances doctrine from its licensing procedure, and the Fifth Circuit was in error in affirming the ICC decision.[2]
 
 
 5
 The Fifth Circuit extensively reviewed the history of the special circumstances doctrine in its opinion. See 722 F.2d at 1244-47. The central issue there, and here, is whether the special circumstances doctrine, which was created by the ICC, has been recognized by the Supreme Court to be statutorily required. Prior to the passage of the Motor Carrier Act of 1935, the trucking industry was economically unstable and dominated by ease of competitive entry. The special circumstances rule arose from the Act itself and was intended to protect the motor transportation system from over competition.
 
 
 6
 The explicit Congressional restriction on rail-affiliated trucking companies was the enactment of high barriers to rail companies' acquisition of trucking companies. Motor Carrier Act of 1935, Sec. 213(a), currently at 49 U.S.C. Sec. 11344(c).[3] The implicit Congressional restriction was recognizing and preserving "the inherent advantages" of each mode of transportation. Motor Carriers Act of 1935, Sec. 202(a), currently at 49 U.S.C. Sec. 10101(a). In contrast to the acquisition provisions, the licensing provisions did not provide for any restrictions on rail companies' operations of trucking companies. However, the ICC interpreted the acquisition provisions of Sec. 11344(c) to mean that not only could railroads not acquire, but that they could not operate as unrestricted trucking companies. The ICC additionally interpreted the National Transportation Policy's requirement of preserving the inherent advantages of each mode as support for protection of the infant trucking industry from the railroads. In I.C.C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945), and later in United States v. Rock Island Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951), the Supreme Court affirmed the ICC's power to restrict the licensing of rail-affiliated trucking companies.
 
 
 7
 The ICC modified its restrictions on the licensing of trucking operations for rail companies in Rock Island Motor Transit Co. Common Carrier Application, 63 M.C.C. 91 (1954). The ICC held that unrestricted authority could be granted to a rail-affiliated trucking company if the rail affiliate could prove that the grant would not restrain competition and that the public interest required the proposed service. This policy was the "special circumstances" exception and the Supreme Court affirmed its use in American Trucking Associations v. United States, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957). The Supreme Court noted that the licensing and acquisitions sections were interpretive brothers, and stated that "the Commission must take 'cognizance' of the National Transportation Policy and apply the Act 'as a whole.' " Id. at 151-52, 78 S.Ct. at 171.
 
 
 8
 In American Trucking Associations v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), the ICC had granted operating licenses to a trucking company that was a wholly owned subsidiary of a railroad. ATA challenged the grant, claiming that the ICC did not properly apply the special circumstances doctrine. The Supreme Court agreed, finding that "[b]oth the Commission and this Court have recognized that Congress has expressed a strong general policy against railroad invasion of the motor field," id. at 6, 80 S.Ct. at 1574, and concluding that the ICC had deviated from this policy by granting operating authority to a railroad subsidiary without finding special circumstances. Id. at 15, 80 S.Ct. at 1578.
 
 
 9
 Tri-State now urges that the principles of American Trucking are violated by the ICC's grant of operating licenses to the Denver/Rio Grande. We must disagree. The ICC was charged by the Supreme Court with applying the Act "as a whole." We believe that when the Act is read as a whole, including the 1980 amendments, the ICC had proper authority to find that the special circumstances doctrine should no longer be recognized.
 
 
 10
 Specifically, the amendments established "a new Federal policy which is designed to promote a competitive and efficient motor carrier industry." H.R.Rep. No. 1069, 96th Cong. 2d Sess. 14 (1980). The legislation mandated eased regulatory entry requirements in order to increase "opportunities for new carriers to get into the trucking business and for existing carriers to expand their services." Id. at 3. Moreover, Congress found that "today most transportation is competitive and many Government regulations affecting railroads have become unnecessary and inefficient." H.R.Rep. No. 1430, 96th Cong. 2d Sess. 79 (1980) U.S.Code Cong. & Admin.News 1980, pp. 3978, 4111. See generally American Trucking Associations v. I.C.C., 722 F.2d 1243, 1249-52 (5th Cir.1984) (detailing the deregulatory approach of the 1980 amendments). We therefore agree with the ICC and the Fifth Circuit ATA decision, id., that the showing required under the special circumstances doctrine of compelling necessity for unrestricted authority for rail-affiliated motor carriers has no place in the procompetitive licensing regulations of the revised Interstate Commerce Act.
 
 
 11
 For the above reasons, the decision of the ICC is affirmed.
 
 
 
 [1]
 ICC and Denver/Rio Grande argue that Tri-State et al. are estopped from challenging the Commission's order on the basis of collateral estoppel. ATA and the Teamsters very well may be estopped from such a challenge based on their participation in a similar challenge of the same issue before the Fifth Circuit. American Trucking Ass'ns, Inc. v. I.C.C., 722 F.2d 1243 (5th Cir.1984). Additionally, Tri-State may be estopped because of its privity with ATA; Tri-State is a member of the Association. Western Coal Traffic League v. I.C.C., 735 F.2d 1408, at 1411 (D.C.Cir.1984), supports this view. Since we approve the grant of the certificate, we need not pass on the estoppel argument
 We also find no abuse of discretion in the ICC's denial of intervention for ATA and the Teamsters in the ICC proceeding. The decision whether to grant a petition to intervene before the ICC is governed by statute, 49 U.S.C. Sec. 10922(b)(7), and by regulation, 49 C.F.R. Sec. 1112.4. The latter states that intervention "may" be granted so long as it does not unduly disrupt or broaden the issues raised in the proceeding. In denying leave to intervene, the ICC stated:
 The ATA and Teamsters had the opportunity to appear when this proceeding was commenced and prior to the decision by the Review Board. They did not choose to do so. Furthermore, the apparent purpose of intervening in this proceeding is to attack the validity of the elimination of the "special circumstances" doctrine. This would unduly broaden the issues raised in this proceeding contrary to our rules of practice [49 C.F.R. 1112.4] and in effect constitutes a collateral attack on Ex Parte No. MC-156. As such, petitioners raise no issues that can properly be considered here. We will deny the petitions of ATA and Teamsters to intervene. Petitioners' interests will not be prejudiced inasmuch as their concerns will be addressed by the Court of Appeals [for the Fifth Circuit].
 Interstate Commerce Commission Decision No. MC-166474 (Sub-No. 1) (Nov. 8, 1983). We find no error in this ruling.
 
 
 [2]
 The ICC argues that, considering the Fifth Circuit's affirmance of Ex Parte No. MC-156, this court does not have jurisdiction to review a subsequent challenge on the substantive validity of an agency's rules. This argument is based on the Hobbs Act, which provides that a party aggrieved by a rule, regulation, or final order of the ICC must file a petition for judicial review within sixty days. 28 U.S.C. Secs. 2342, 2344. We agree that this rule now precludes an attack on the procedure by which the policy was adopted. However, we hold that the Hobbs Act does not bar judicial review on the substantive validity of the rule, even if more than sixty days have elapsed since its issuance. As the District of Columbia and Fifth Circuits have noted, "administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity." Texas v. United States, 730 F.2d 409, 415 (5th Cir.1984) (quoting Functional Music, Inc. v. FCC, 274 F.2d 543, 546 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959))
 
 
 [3]
 Section 11344(c) provides in pertinent part:
 When a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transportation involves a motor carrier, the Commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition.